******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE CONNECTICUT *v.* EFRAIN JOHNSON
(AC 37577)

Gruendel, Mullins and Sullivan, Js.*

*Argued October 13, 2015—officially released May 10, 2016*

(Appeal from Superior Court, judicial district of
Fairfield, Kavanewsky, J.)

*Glenn W. Falk*, assigned counsel, for the appellant
(defendant).

*Susann E. Gill*, supervisory assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, *Joseph T. Corradino*, senior assistant state's attorney, and *Peter D. Markle*, assistant United States attorney, for the appellee (state).

*Opinion*

SULLIVAN, J. The defendant, Efrain Johnson, appeals from the judgment of conviction, rendered after a jury trial, of one count of felony murder in violation of General Statutes § 53a-54c and one count of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A) for his participation in events that led to the death of the victim, Tina Johnson.[1] On appeal, the defendant claims that (1) there was insufficient evidence to sustain either of his convictions and (2) the trial court improperly instructed the jury on the third element of felony murder. We affirm the judgment of the trial court.

By way of an amended information dated December 18, 2013, the state charged the defendant with six offenses: as a principal in the felony murders of three individuals, namely, the victim, James Reid, and Basil Williams (counts one, two, and three, respectively), and as a principal in the kidnapping in the first degree for those same people (counts four, five, and six, respectively).[2] On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. For most of the time relevant to this case, Azibo Aquart[3] headed a criminal organization selling crack cocaine and marijuana in certain cities in southern Connecticut. As part of this operation, Azibo used certain apartments at 215 Charles Street in Bridgeport, in particular using apartment 211 on the second floor to conduct transactions. Azibo considered the apartments his "turf" and had driven away competitors on prior occasions.

Azibo's enterprise involved a number of individuals in a variety of tasks. Two such confederates were Azibo's brother, Azikiwe Aquart,[4] and Rodney Womble. Other individuals employed by Azibo included: Frankie Hodges, who sold crack cocaine out of apartment 211 at 215 Charles Street; John Taylor, who sold marijuana on Azibo's behalf in Norwalk; Lashika Johnson, the defendant's sister, who sold crack cocaine and marijuana on behalf of Azibo and, later, Azikiwe, and who was dating Azibo for much of the time relevant to this case; and the defendant, who purchased marijuana from Azibo both for personal use and to resell. A number of the individuals working for Azibo's drug enterprise either began as customers or were otherwise users of Azibo's product themselves.

During much of August, 2005, the victim, Reid, and Williams lived in apartment 101 at 215 Charles Street. Both the victim and Reid used crack cocaine and regularly purchased it from Azibo's operation in apartment 211.

In early August, 2005, the quality of the crack cocaine that Azibo was selling in 215 Charles Street decreased substantially. At about this time, the victim stopped

purchasing crack cocaine from Azibo's operation on the second floor and began selling crack cocaine out of apartment 101. As a consequence, Azibo began losing a number of customers.

Azibo was displeased by the victim's actions and subsequently attempted on at least two occasions to break into apartment 101 with the assistance of various confederates. During one such instance, Hodges heard a knock on the door of apartment 211 in the middle of the night. Looking through the peephole, Hodges observed Azibo, who was wearing black clothing, a black bandana, and plastic gloves and motioning for Hodges to join him in the hallway. Azibo whispered to Hodges to go to the first floor and knock on the door to a specific apartment. As Hodges and Azibo headed downstairs, Hodges perceived that three people were in the second floor laundry room; although he avoided looking at the people's faces, he could see that all of them also were wearing plastic gloves. While Azibo hid in the stairwell, Hodges knocked on the door to apartment 101, but nobody came to the door. Relieved that no one had answered, Hodges informed Azibo and returned to the second floor while Azibo and the three other individuals went downstairs.

Taylor also was present for two of the attempts to enter the first floor apartment. In the first attempt, Taylor received a phone call from Azibo. Taking the train from Norwalk to Bridgeport, Taylor met up with Azikiwe and Azibo; at Azibo's direction, the group drove to a Walgreens store, where Azibo purchased duct tape. The three then drove to the diner near 215 Charles Street. By the time they arrived at the diner, it was dark outside. The group waited at the diner until Azibo got a phone call, at which point they went out to the parking lot. The defendant met the three men in the parking lot of the diner. He brought two bats with him, giving one to Azikiwe and retaining the other. The bats were the first weapons that Taylor observed among the four men. In the parking lot, Azibo told Taylor, Azikiwe, and the defendant that there were people selling drugs out of his building, "[h]e had a problem" with this, and the group was going to go in and "confront them." The four men voluntarily put on masks and latex gloves provided by Azikiwe,[5] entered the building, and waited down the hall while a young woman knocked on the door to apartment 101. When no one answered, Azibo, Azikiwe, and Taylor went upstairs, and the defendant left with the bats.[6]

A second attempt involving Taylor to enter apartment 101 occurred a few days after the first attempt. During the day on August 23, 2005, the defendant contacted Azibo about getting more marijuana. Azibo brought the marijuana over to the defendant and, giving the defendant two additional bags, stated that he might need a favor later. That evening, the defendant, with the

assistance of Lashika and others, promoted a party at a Bridgeport club. Between approximately 1:30 to 2:30 a.m. on August 24, 2005, the group finished cleaning up and went to a restaurant in Orange. While there, Lashika received a phone call from Azibo, who asked to speak with the defendant. The defendant did not look upset after receiving this phone call. After finishing their meal, Lashika and the defendant left the restaurant in separate vehicles. Returning home, Lashika saw Azibo outside her apartment, though she did not see the defendant; after seeing Azibo, Lashika went to sleep.

Taylor also received a phone call from Azibo and drove to Bridgeport that night, where he met up with Azibo and Azikiwe. Azikiwe drove the group to the parking lot underneath the apartments at 215 Charles Street. Exiting the car, Taylor saw the defendant walking up to them. The defendant again brought two bats with him, which were the first weapons that Taylor had observed among the four men on this occasion as well, and all of the men put on latex gloves and masks provided by Azikiwe. Taking care not to be seen, the group went upstairs to apartment 101. During this period, Taylor observed that both the defendant and Azikiwe were armed with baseball bats, while Azibo had a gun. Once there, one or more members of the group forced open the door to apartment 101, and the four men entered the apartment.

Inside the apartment, Azibo instructed Taylor to stand by the living room window and to take a lookout position. Azibo and Azikiwe then proceeded to use duct tape to bind the victim and Reid in the first bedroom. While duct taping these two individuals, Azibo's gloves ripped, and he replaced them; Azikiwe similarly replaced his gloves while in the apartment. The defendant likewise participated in binding the victim's wrists and ankles to some degree. While in the apartment, Taylor also observed the defendant standing in the hallway by the bathroom near the first bedroom. Walking between the window at which he was stationed and the bedroom, Taylor saw both Azibo and Azikiwe strike the victim and Reid in the head multiple times with the baseball bats. At some point while the men were in the apartment, Williams was bound and injuries similar to those suffered by the victim and Reid were inflicted upon him. Additionally, one of the four participants inserted several screws into the doorjamb of the front door from the inside before leaving through the window. Again, Taylor did not observe the defendant being threatened by, or try to stop, Azibo and Azikiwe during their time in apartment 101.

Eventually, the four left the apartment: Taylor and Azikiwe in one vehicle, and the defendant and Azibo in another. The defendant observed a black drill in a bag that Azibo brought with him to the car after leaving the apartment. The defendant, Azibo, and Azikiwe

reconvened at Lashika's apartment, where the defendant frequently stayed. Lashika was awakened by voices in her living room, two of which she was able to identify as the defendant and Azibo. Leaving her bedroom, she discovered the defendant, Azibo, and Azikiwe sitting in the living room. Azibo and Azikiwe were wearing only undershirts, shorts, and socks. Azibo asked Lashika to take the garbage bags and a black electric drill belonging to Azibo to a dumpster down the street. Lashika disposed of the bags as requested, wearing plastic gloves to move the items. When she returned, Azibo asked her to move his car and retrieve clothing for him from his apartment, which she did. Azibo, Azikiwe, and the defendant were all there when she came back from this second errand.

Later that morning, the victim's son, Leroy Whittingham, attempted to call his mother multiple times, but was unable to reach her. At or about 10 a.m., he walked over to his mother's apartment; getting no response when he knocked on her front door, he walked around the side of the building to the window of her bedroom. Discovering the window open, Whittingham pushed the blinds aside and saw the victim and Reid. Both parties were bound in duct tape on the floor, and there was blood on the floor and ceiling. Whittingham entered the apartment and called 911 from his cell phone. An ambulance and police were dispatched.

Karen O'Donnell, an emergency medical technician for American Medical Response, and her partner, Rosanna Mendoza, received the call at approximately 10:15 a.m. Driving toward the address to which they were directed, O'Donnell saw a person waving them down and pointing to the apartment building behind the diner. O'Donnell and her partner entered the building; while they were walking up the stairs toward the apartment, Whittingham kicked open the front door. Discovering the victim and Reid in the first bedroom and Williams in the second bedroom, O'Donnell and her partner quickly determined that all three residents were deceased.

Investigators processed the apartment over the course of three days. They discovered the screws that had been affixed to the front door and door frame from inside the apartment, which would have prevented the door from being opened. Investigators also discovered various items and removed them from the apartment for further examination; these items included pieces of latex and latex gloves, samples of blood-like substances, the duct tape used to bind the head, hands, and feet of the three residents, and two plastic bags stuck together with duct tape. Additionally, after removing the duct tape binding the victim's wrists, investigators discovered a piece of latex attached to the inside of the duct tape. No weapons were recovered from the apartment.

The items collected were turned over to the state forensic laboratory, and forensic testing determined that many of the fingerprints that were discovered in the apartment or on the items seized as evidence were attributable to Azikiwe and Azibo. DNA was also extracted from the various gloves, latex fragments, and other items recovered from apartment 101, and was submitted for further testing. This testing compared DNA profiles developed from these recovered samples to profiles of known samples taken from the involved parties. The profiles developed for each sample were then cross-referenced with a database, which allows the technicians to determine the frequency with which an individual within the three major population groups of Connecticut (African-American, Caucasian, or Hispanic) would be expected to be a contributor. This testing identified Azikiwe, Azibo, and the defendant as contributors to the various samples, while none of the three of them or Taylor could be eliminated as a contributor to other samples.[7] Only the defendant was a contributor to the sample of DNA taken from the latex fragment recovered from the duct tape binding the victim's wrists; each of the other known samples was eliminated. The expected frequency of a person being a contributor to that particular sample was one in seven billion individuals from the three population groups.[8]

Frank Evangelista, associate medical examiner for the state, conducted the autopsy of the victim in August, 2005. External and internal examinations revealed profound and substantial injuries to the victim's wrist, face, skull, and brain.[9] These injuries, both external and internal, were consistent with blunt force trauma and would have required multiple blows. Consequently, Evangelista concluded that the victim's death had been caused by blunt head trauma inflicted by another party. The autopsies of Reid and Williams revealed that they had suffered similar injuries, which caused their deaths.

A few days after August 24, 2005, the defendant went to a music concert with Lashika, Azibo, and Azikiwe, and when the defendant's sister drove him to Philadelphia a few weeks later, Azikiwe joined them. Although the defendant did not know that Azikiwe would be joining them on the trip to Philadelphia, he did not voice any reluctance about Azikiwe joining them. When Lashika eventually inquired about what happened at 215 Charles Street, the defendant responded that he had not hurt or killed anyone, though he had "roughed somebody up," that he had helped tie up someone, and that the group had gotten rid of the bats they had with them in the apartment.

On March 6, 2007, the defendant was interviewed by Christopher Munger, a special agent with the Federal Bureau of Investigation (FBI), at its Bridgeport office. When asked about his involvement in the events at 215 Charles Street, the defendant changed his story multiple

times. He first claimed that he had not been there for seven to nine years. When told that his DNA had been recovered from apartment 101, the defendant asked if he could "start over." In his second version of events, the defendant told the agent that he had been asked by Azibo on August 23, 2005, to go up to the door and pretend to be interested in buying crack cocaine, that he got into a verbal altercation with the woman who opened the door, that during this incident, he spit in her face, she slammed the door, and that he left afterward. When told that the DNA had been recovered from the latex glove fragment in the duct tape bindings, the defendant asked to start over again. This time, the defendant provided an account of his involvement that placed him in the apartment binding the victim's wrists and feet with duct tape on the day that she was killed.

Over the course of the investigation, cell phones were seized from the defendant and Azikiwe, and investigating detectives became aware of a phone number that ultimately was attributed to Azibo. Information was obtained both from these cell phones, and from records of the associated service providers for these phones and numbers associated with Womble, Taylor, the victim, and Lashika. Analyzing this information, agents with the FBI were able to identify a number of calls during the days leading up to the murders between the phones associated with Azibo, Azikiwe, the defendant, and Taylor. In particular, this information showed that: the phone seized from the defendant had been in contact with the phone associated with Azibo seven times on August 24, 2005, the first time being at 1:47 a.m. and the last at 5:50 a.m.; the last phone to call the phone associated with Azibo was the phone associated with Taylor; there was no contact between the phone associated with Azibo and any other phone between 5:04 and 5:43 a.m.; and the first number that the phone associated with Azibo called after 5:43 a.m. on August 24, 2005, was the phone associated with the defendant.

Following a jury trial, the defendant was found guilty of felony murder and kidnapping involving the victim; the jury also found the defendant not guilty as to all other charges and lesser included offenses. The trial court, *Kavanewsky, J.*, sentenced the defendant to a total effective term of fifty years imprisonment. This appeal followed.[10] Additional facts will be discussed as necessary.

## I

First, the defendant claims that the evidence did not support his convictions for felony murder or kidnapping in the first degree, arguing that there was insufficient evidence to show that he possessed the requisite intent to commit an assault or kidnapping, respectively. We disagree.

"The standard of review we apply to a claim of insuffi-

cient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Crespo*, 317 Conn. 1, 16, 115 A.3d 447 (2015). "On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) Id., 17.

Both of the defendant's sufficiency claims go to whether he had the requisite specific intent to commit the crimes for which he was convicted. Pursuant to General Statutes § 53a-3 (11), "[a] person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . ." "Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one." (Citation omitted; internal quotation marks omitted.) *State* v. *Booth*, 250 Conn. 611, 656, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000). "[I]ntent may be inferred from the events leading up to, and immediately following, the conduct in question . . . the accused's physical acts and the general surrounding circumstances. . . . An accused's own words . . . constitute particularly compelling, direct evidence of his intent." (Citations omitted.) *State* v. *Winot*, 294 Conn. 753, 768, 988 A.2d 188 (2010). We will examine in turn the evidence regarding each of the defendant's convictions.

A

The defendant first argues that there was insufficient evidence that he entered the victim's apartment with the intent to commit an assault therein, which was required to sustain his conviction of the felony murder charge. We disagree.

In count one of the amended information, the state charged the defendant with felony murder for the victim's death in the course of and in furtherance of a burglary in the third degree, specifically, a burglary in which the defendant and his associates unlawfully

entered apartment 101 with the intent to commit an assault in the third degree.

Section 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, such person commits or attempts to commit . . . burglary . . . and, in the course of and in furtherance of such crime or of flight therefrom, such person, or another participant, if any, causes the death of a person other than one of the participants . . . ."[11] "There is no requirement under the felony murder statute, nor was there such a requirement under common law felony murder, that the state prove that the respondent had the general intent to commit the murders. . . . The state must simply prove all the elements of the underlying felony and then prove that the deaths were in the course of and in the furtherance of that felony, or that the deaths were caused in flight from the commission of the felony." (Citation omitted.) *In re Michael B.*, 36 Conn. App. 364, 372, 650 A.2d 1251 (1994).

General Statutes § 53a-103 (a) provides in relevant part: "A person is guilty of burglary in the third degree when he enters . . . unlawfully in a building with intent to commit a crime therein." Finally, General Statutes § 53a-61 (a) provides in relevant part: "A person is guilty of assault in the third degree when . . . [w]ith intent to cause physical injury[12] to another person, he causes such injury to such person or to a third person . . . ." (Footnote added.)

When appraising whether a party had the requisite intent to commit burglary, the jury could consider whether "[t]he time, manner and forcible nature of the entry permitted a reasonable inference, based on human experience, that the unlawful entry by the defendant was hardly without purpose, but rather was with the intent to commit a crime therein." (Internal quotation marks omitted.) *State* v. *Drake*, 19 Conn. App. 396, 400, 562 A.2d 1130 (1989), quoting *State* v. *Little*, 194 Conn. 665, 675, 485 A.2d 913 (1984). Similarly, with respect to whether an accused intended to commit an assault, "[i]ntent may be gleaned from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading up to and immediately following the incident." (Internal quotation marks omitted.) *State* v. *Ramirez*, 107 Conn. App. 51, 64, 943 A.2d 1138 (2008), aff'd, 292 Conn. 586, 973 A.2d 1251 (2009).

The evidence produced at trial demonstrated that Azibo previously had run out competitors to his drug operation in the apartments at 215 Charles Street and that he sought to protect his drug operation from the increased competition by the victim at the time when his product was suffering. The defendant brought baseball bats to a meeting among Azibo, Azikiwe, Taylor, and the defendant, at which Azibo articulated his issues with the victim's selling drugs in his building and his

intention "to confront" the victim. Importantly, all four participants were involved in Azibo's drug operation.

Subsequently, the defendant was involved in at least two attempts to enter the apartment on the first floor. Each of these attempts occurred late at night, and the group took efforts to evade detection or identification, including the use of masks and latex gloves and hiding from another resident of 215 Charles Street. During the first attempt in which both Taylor and the defendant participated, the group left when it became apparent that no one was going to answer the door.

Further, although the defendant contended that he had not seen a weapon prior to entering apartment 101, the jury heard testimony that the defendant brought baseball bats to, and was armed with, one of these bats during at least two attempts to enter apartment 101, including the attempt that ultimately resulted in the deaths of the victim, Reid, and Williams. The jury also heard testimony that the group entered apartment 101 on August 24, 2005, only after Azibo kicked down the door. The jury reasonably could have relied on this evidence of a violent entry in determining that the entry into the apartment was for the purpose of an assault. See *State* v. *Ramirez*, supra, 107 Conn. App. 64; *State* v. *Drake*, supra, 19 Conn. App. 400; see also *State* v. *DeMarco*, 311 Conn. 510, 519–20, 88 A.3d 491 (2014) ("[i]t is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony" [internal quotation marks omitted]); *State* v. *Meehan*, 260 Conn. 372, 381, 796 A.2d 1191 (2002) ("[i]t is axiomatic that evidentiary inconsistencies are for the jury to resolve").[13]

The evidence further demonstrated that Azibo and Azikiwe proceeded to bind the residents of the apartment, with some assistance from the defendant, immediately after entering the apartment, and that they used the baseball bats to strike both the victim and Reid in the head. During this period, both the defendant and Taylor served as lookouts, with the defendant positioned outside the bedrooms in the hall.

Further, Taylor testified that he did not observe any of the four participants threatened or ordered to participate during either attempt, and that no one in the group tried to stop the beatings in the apartment. Lashika also testified that although she had never received a call from Azibo when he was trying to reach the defendant prior to August 24, 2005, the defendant did not look upset after getting such a call at the restaurant. She also stated that, when she inquired after the fact about what had occurred at 215 Charles Street, the defendant admitted that "he roughed somebody up" during the incident. Although he testified that he was merely present on the night that the murders occurred and that he participated only out of fear for his own safety, the

defendant also agreed with the prosecutor that he knew that "trouble was coming" for the residents of apartment 101 and that, based on the size of the group and the dark clothing that they were wearing, that "[s]omething that ain't right" was about to occur.

Taken as a whole, the evidence demonstrates that: the defendant brought baseball bats to a meeting after dark near the 215 Charles Street apartments; at this meeting, Azibo explained to the defendant and the others in attendance that he intended "to confront" the victim for selling in his building; subsequent to learning this, the defendant knowingly participated in two attempts to enter apartment 101; during each attempt, the participants took considerable pains to avoid identification or interference prior to entry into the apartment; and, during the second attempt to enter the apartment, the baseball bats that the defendant brought were used to beat the victim and Reid after the defendant assisted Azibo and Azikiwe in binding the victim's wrists and while the defendant stood as a lookout in the hallway.

In support of his contention that there was insufficient evidence to demonstrate that he had the necessary intent, the defendant notes that there is no evidence that he knew, or had any particular vendetta against, the residents or that he personally committed any assaults directly on their person, which he argues weighs against a finding that he had a specific intent to commit an assault in the apartment. Neither proof of motive[14] nor the actual commission of the intended crime on which a burglary conviction could be based[15] is required, however, to find that the defendant had the specific intent to commit an assault at the time of his unlawful entry.

The defendant further contends that merely bringing the baseball bats to apartment 101 does not prove his intent to commit an assault therein and that any reckless or negligent state of mind that could be proved is insufficient for the defendant to be liable for the crime alleged in the information. In support of these arguments, the defendant relies on two cases, *State* v. *Crosswell*, 223 Conn. 243, 612 A.2d 1174 (1992), and *Warwick* v. *United States*, 528 A.2d 438 (D.C. 1987). Both of these cases are distinguishable from the facts before the court, as the evidence in each case demonstrated that, although the defendant or one of his associates was armed at the time of the illegal entry into the residence, the purpose of the invasion was to deprive the residents of property. Thus, the assault that occurred *after* the entry into the residence with the weapon meant to facilitate that purpose was not enough to show that the assault was intended or planned *prior* to the time of entry. See *State* v. *Crosswell*, supra, 263–64; *Warwick* v. *United States*, supra, 442. In the present case, however, the clear weight of the evidence suggests that the purpose of the entry into apartment 101 was the assault itself,

rather than a larceny or robbery in which one or more participants merely were willing to use force if required.

"[W]hen a jury evaluates evidence of a defendant's intent, it properly rel[ies] on its common sense, experience and knowledge of human nature in drawing inferences and reaching conclusions of fact." (Internal quotation marks omitted.) *State* v. *Winot*, supra, 294 Conn. 768; see also *State* v. *Washington*, 155 Conn. App. 582, 589, 110 A.3d 493 (2015) ("[t]he juror must use all his [or her] experience, his [or her] knowledge of human nature, his [or her] knowledge of human events, past and present, his [or her] knowledge of the motives which influence and control human action, and test the evidence in the case according to such knowledge and render his [or her] verdict accordingly" [internal quotation marks omitted]). In determining whether sufficient evidence existed that an accused party had the requisite intent for the crime of which he or she was convicted, we look to the totality of the evidence and all reasonable inferences that can be drawn from it. See *State* v. *Best*, 56 Conn. App. 742, 753–59, 745 A.2d 223, cert. denied, 253 Conn. 902, 753 A.2d 937 (2000); see also *State* v. *Booth*, supra, 250 Conn. 654–58.

Consequently, the jury reasonably could have determined that the defendant, by bringing baseball bats and participating in the attempts to enter apartment 101 with the knowledge that the plan to enter apartment 101 involved some degree of physical harm to the residents, and in light of the time and manner of entry and the relationship between the participants, shared Azibo's intent to inflict physical injury on the victim. See *State* v. *Ortiz*, 312 Conn. 551, 565, 93 A.3d 1128 (2014) ("it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct" [emphasis omitted; internal quotation marks omitted]). Even assuming arguendo that evidence in the record could support that the defendant intended something other than an assault, it was the jury's responsibility to determine which of these alternative and supported explanations was the most likely. See *State* v. *Booth*, supra, 250 Conn. 655. We, therefore, conclude that there was sufficient evidence on which the jury could have found the defendant guilty of the felony murder of the victim.

B

The defendant also claims that there was insufficient evidence to support his conviction for kidnapping in the first degree because there was insufficient evidence that he intended to inflict physical injury on the victim. We disagree.

"A person is guilty of kidnapping in the first degree, pursuant to General Statutes § 53a-92 (a) (2) (A), if he abducts another person and . . . restrains the person abducted with intent to . . . inflict physical injury

upon him . . . . General Statutes § 53a-91 (2) defines abduct as restrain[ing] a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation. The term restrain is also defined in § 53a-91 (1) as restrict[ing] a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent." (Internal quotation marks omitted.) *State* v. *Wilcox*, 254 Conn. 441, 464–65, 758 A.2d 824 (2000).

In support of his claim that there was insufficient evidence that he intended to inflict injury on the victim, the defendant relies on his assertion that there was no evidence that he ever inflicted any physical injury on the victim. Even if we were to accept that there was no such evidence,[16] we would reject this reliance. Not only does the statute merely require the *intent* to inflict physical injury, not the consummation of that intent; see General Statutes § 53a-92 (a) (2) (A); the jury was charged by the court that the defendant could be found liable either as a principal or as an accessory.[17] Given the defendant's knowledge and actions prior to entering the apartment and the violent manner in which that entry was effected, the jury reasonably could have inferred that his actions in binding the victim's wrists and standing in the hallway as a lookout were for the purpose of aiding Azibo and Azikiwe, who were both armed with baseball bats that the defendant had brought to the apartment, in inflicting injury to the victim.

Further, as we previously articulated in part I A of this opinion, on the basis of the evidence submitted at trial, the jury reasonably could have found that the defendant possessed the specific intent to inflict physical injury on the victim when he and his cohorts entered the apartment carrying baseball bats. Once inside the apartment, the defendant was given duct tape and participated, at least briefly, in using that duct tape to bind the victim's wrists and ankles. At some point after both the victim and Reid were bound, Azibo and Azikiwe, armed with the baseball bats that the defendant had brought to the apartment, used those bats to strike the victim and Reid while the defendant was standing in the hallway between the two bedrooms acting as a lookout. The defendant did not try to stop these beatings.

Thus, because we already have determined in part I A of this opinion that the jury was permitted, although not required, to infer that "[the] defendant intended the natural consequences of his voluntary conduct"; (emphasis omitted; internal quotation marks omitted)

*State* v. *Ortiz*, supra, 312 Conn. 565; we agree with the state that the jury reasonably could have found that the defendant possessed the same intent as his cohorts and, accordingly, conclude that there was sufficient evidence supporting the defendant's conviction for kidnapping in the first degree.

## II

The defendant also claims that the trial court committed a number of errors in its jury instructions concerning the third element of felony murder. Under the relevant portion of § 53a-54c, a defendant is liable only for a death caused "in the course of and in furtherance of [the predicate crime] or of flight therefrom . . . ." We disagree with each of the defendant's claims of error with respect to the trial court's instructions on this element and consider each one separately.

## A

### Instructions that Death Must Occur "in the Course of" the Burglary

The defendant asserts that the court improperly instructed the jury with respect to the requirement that the death must occur "in the course of" the burglary in two respects. The defendant argues that the trial court, by adding certain language in its charge, (1) improperly expanded the scope of felony murder and (2) took a disputed issue away from the jury.

### 1

### Preservation

The state argues that neither of these claims was preserved because the defendant's request to charge and exceptions at trial were inadequate to alert the trial court to the errors. The state further argues that this court should not consider these unpreserved claims because the defendant either induced these errors or has waived them pursuant to *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011).[18] The defendant responds that these claims were preserved at trial and, to the extent that the claims were not preserved, review is appropriate under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989); see also *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying *Golding*'s third condition). We agree with the defendant that his claims were preserved.

The following additional facts are relevant to our consideration of these issues. On December 17, 2013, defense counsel submitted proposed jury instructions in court, which included an extensive charge on each element of felony murder. With respect to the third element, the defendant's proposed instructions provided in relevant part: "The third element of felony [murder] is that the defendant or another participant caused the death of Tina Johnson (as to Count One) James Reid (as to Count Two) and Basil Williams (as

to Count Three) while in the course of, and in furtherance of, the commission or attempted commission of the crime of burglary in the third degree, or, in the immediate flight from the crime. This means that as to each count, the death occurred during the commission of the burglary and in the course of carrying out its objective.

" 'In the course of the commission' of the burglary means during any part of the defendant's participation in the burglary. The phrase 'in the course of the commission' is a time limitation and means conduct occurring immediately before the commission, during the commission or in the immediate flight after the commission of the burglary. Thus, the respective deaths of Tina Johnson, James Reid, and Basil Williams must have occurred somewhere within the time span of the occurrence of the facts which constitute the charged burglary."

On December 18, 2013, the court stated on the record that it had e-mailed portions of its proposed charge to counsel the prior evening and that full copies of the charge were being printed for counsel to review.[19] At about noon, the court indicated that it would dismiss the jury until 2 p.m. and that, during this break, it would meet with counsel to discuss the full charge and provide copies to them. Subsequently, the parties met in chambers, where defense counsel attempted to articulate certain objections to the court's charge, and the trial court indicated that it would hear these objections on the record during the charge conference.[20]

When court reconvened later that afternoon, the court stated that it had e-mailed much of its proposed charge to counsel on December 17, 2013, that counsel had been given a full copy of the charge during the lunch recess, and that the court would make a few changes to its instructions. It then reviewed its proposed instructions with counsel and sought comments from counsel. In response to defense counsel's contention that she had only a few objections, the court noted that any objections covered by the defendant's written request to charge did not have to be restated. Consequently, defense counsel expressed concern only with the court's intention to give instructions on consciousness of guilt, which the court withdrew after closing arguments.

On December 19, 2013, the court indicated on the record that it had made some changes to its felony murder charge suggested by defense counsel; the court, however, did not articulate those changes.[21] It then charged the jury. During its charge on felony murder, the court recited the statutory language of § 53a-54c and charged the jury on each of the elements of felony murder.[22]

Following its charge, the court inquired whether

either party had any exceptions. The prosecutor had none. Defense counsel, however, took exception to several aspects of the charge. She excepted to the court's charge on accomplice testimony. Defense counsel also excepted to the charge concerning the third element of felony murder, noting that it had included proposed language on both the "in the course of" and "in furtherance of" aspects, and that the court improperly had added the language "in the course of carrying out its objective" to its instructions defining the former aspect.[23]

Immediately following this exception and as defense counsel was about to articulate her exception to the instructions on the affirmative defense to felony murder, the trial court indicated that it considered preserved any requested instruction contained within the defendant's submitted request to charge that had not been given as proposed, regardless of whether the deviation concerned the omission of, or an addition to, the instruction as proposed.[24] In light of these statements by the court, defense counsel briefly excepted to the court's instructions on the statutory defense to felony murder, duress, and kidnapping; the court then overruled the defendant's exceptions.

Pursuant to Practice Book § 42-16, "[a]n appellate court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception has been taken by the party appealing immediately after the charge is delivered. Counsel taking the exception shall state distinctly the matter objected to and the ground of exception. . . ." Thus, "a party may preserve for appeal a claim that an instruction, which was proper to give, was nonetheless defective either by: (1) submitting a written request to charge covering the matter; or (2) taking an exception to the charge as given. . . . Moreover, the submission of a request to charge covering the matter at issue preserves a claim that the trial court improperly failed to give an instruction on that matter." (Citations omitted.) *State* v. *Ramos*, 261 Conn. 156, 170, 801 A.2d 788 (2002), overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 754, 91 A.3d 862 (2014).

Under either method, some degree of specificity is required, as a general request to charge or exception will not preserve specific claims. See *State* v. *Ramos*, supra, 261 Conn. 170–71 ("[i]t does not follow, however, that a request to charge addressed to the subject matter generally, but which *omits* an instruction on a specific component, preserves a claim that the trial court's instruction regarding that component was defective" [emphasis in original]); *State* v. *Lee*, 138 Conn. App. 420, 453 n.19, 52 A.3d 736 (2012) ("[i]n order to preserve an objection to a proposed jury instruction, the defendant must plainly put the trial court on notice as to

the specific basis for his objection" [internal quotation marks omitted]). Thus, a claim concerning an improperly delivered jury instruction will not be preserved for appellate review by a request to charge that does not address the specific component at issue; see, e.g., *State* v. *Ramos*, supra, 169–71 (proposed jury instructions on self-defense did not include charge on provocation exception); or by an exception that fails to articulate the basis relied upon on appeal with specificity. See *State* v. *Payne*, 121 Conn. App. 308, 318, 996 A.2d 302 (neither precharge objection nor postcharge exception included ground for objection), cert. denied, 297 Conn. 919, 996 A.2d 1193 (2010); see also *State* v. *Lee*, supra, 453 (defense counsel voiced concern about definition of conspiracy but not about instruction on intent element of conspiracy). Where the defendant has submitted a request to charge with proposed instructions on the issue, however, our Supreme Court "never ha[s] required . . . [the] defendant . . . also to take an exception to a contrary charge, and such a requirement would contravene the plain language of [Practice Book § 42-16]." *State* v. *Paige*, 304 Conn. 426, 443, 40 A.3d 279 (2012); see also *State* v. *Johnson*, 316 Conn. 45, 55–56, 111 A.3d 436 (2015) (claim preserved by request to charge where court gave requested charge, but selectively omitted certain passages);[25] *State* v. *Ross*, 269 Conn. 213, 337–38, 849 A.2d 648 (2004) (instructional claim that trial court used different word than statutory requirements preserved where defendant did not take exception, but had "file[d] a specific request to charge on the issue").

In the present case, the defendant filed a request to charge, which included proposed instructions on each element of felony murder. In it, the defendant included the phrase "in the course of carrying out its objective," but only at the beginning of the charge, where the phrase primarily serves as a gloss on the "in furtherance of" requirement.[26] Consequently, the court added the proposed language in its charge in the place requested, but also included similar language elsewhere in the charge and added unrequested language concerning the specific "objective" of the burglary. Given that the defendant filed a request to charge and the trial court's charge deviated as to a specific component from these proposed instructions, the defendant's request to charge has preserved these issues for appeal.[27]

As we consider these claims preserved, we do not reach the defendant's or the state's claims concerning whether this court should address these claims if they were unpreserved. With respect to the state's arguments that the defendant induced the error of which he now complains, we briefly note that in addressing whether a defendant's claims of instructional error should not be reviewed pursuant to *State* v. *Golding*, supra, 213 Conn. 233, because they were induced, our Supreme Court has distinguished cases where the language to

which the defendant objects is precisely that which the defendant requested from situations where the trial court has modified the language requested. See *State* v. *Cruz*, 269 Conn. 97, 106, 848 A.2d 445 (2004), discussing *State* v. *Whipper*, 258 Conn. 229, 780 A.2d 53 (2001), overruled in part by *State* v. *Cruz*, 269 Conn. 97, 106, 848 A.2d 445 (2004), and in part on other grounds by *State* v. *Grant*, 286 Conn. 499, 535, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008).

In the present case, the language "in the course of carrying out its objective" can be found in the defendant's request to charge, where it was used primarily to clarify the "in furtherance of" prong of the third element; neither the phrase nor the language concerning the precise "objective" of the burglary, however, appears in this section of the defendant's request to charge. The record also suggests that the court made changes to the felony murder charge, but it did not explain the extent of those changes, and the partial and complete charges that the court distributed to the parties prior to this statement have not been provided to this court. Therefore, this case is more analogous to *Whipper* than to *Cruz*, and we conclude that the errors from which the defendant appeals generally were not induced in his request to charge.[28]

2

Merits

We turn to the substance of the defendant's two claims of error with respect to the trial court's charge on the "in the course of" prong. With respect to the defendant's first claim of error, the defendant contends that the court erred by including the phrase "and in the course of carrying out its objective" when defining how this prong could be met. With respect to the second claim of error, he argues that the court's unequivocal statement that "the objective [of the burglary] was an assault" took away a disputed factual issue from the jury's consideration.

"Our analysis begins with a well established standard of review. When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . .

"It is . . . constitutionally axiomatic that the jury be

instructed on the essential elements of a crime charged. . . . The due process clause of the fourteenth amendment protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. . . . Consequently, the failure to instruct a jury on an element of a crime deprives a defendant of the right to have the jury told what crimes he is actually being tried for and what the essential elements of those crimes are. . . .

"[I]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . The test is whether the charge as a whole presents the case to the jury so that no injustice will result. . . . We will reverse a conviction only if, in the context of the whole, there is a reasonable possibility that the jury was misled in reaching its verdict. . . . A jury instruction is constitutionally adequate if it provides the jurors with a clear understanding of the elements of the crime charged, and affords them proper guidance for their determination of whether those elements were present. . . . An instruction that fails to satisfy these requirements would violate the defendant's right to due process of law as guaranteed by the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution. . . . The test of a charge is whether it is correct in law, adapted to the issues and sufficient for the guidance of the jury. . . . The primary purpose of the charge is to assist the jury in applying the law correctly to the facts which they might find to be established. . . . The purpose of a charge is to call the attention of the members of the jury, unfamiliar with legal distinctions, to whatever is necessary and proper to guide them to a right decision in a particular case." (Citations omitted; internal quotation marks omitted.) *State* v. *Griggs*, 288 Conn. 116, 124–26, 951 A.2d 531 (2008).

The defendant's first claim is that, by adding the phrase "in the course of carrying out its objective" to its instructions on the "in the course of" prong, the trial court improperly enlarged the scope of felony murder. Because "[i]t is axiomatic that the state is required to prove all the essential elements of the crimes charged beyond a reasonable doubt in order to obtain a conviction . . . [a] jury instruction that effectively relieves the state of its burden to prove an essential element of the crime charged implicates the defendant's right to due process." (Citations omitted; internal quotation marks omitted.) *State* v. *Jacobson*, 87 Conn. App. 440, 463, 866 A.2d 678 (2005), aff'd, 283 Conn. 618, 930 A.2d 628 (2007).

In the present case, the trial court provided the following instructions on the requirement that the death

must occur "in the course of" the underlying felony: "Now, in the course of the commission of the burglary means during any part of the defendant's participation in the burglary. The phrase, in the course of the commission, is a time limitation and means conduct occurring immediately before the commission or during the commission of the burglary and in the course of carrying out its objective.

"Thus, the death of the decedent named in each count must have occurred somewhere within the time span of the occurrence of the facts which constitute the burglary and in the course of carrying out its objective.

"Also, the immediate murder of a person to eliminate a witness to a crime or to avoid detection is also in the course of the commission. In this regard, if you find one or more persons—or one or more of the decedents, I should say—was killed simply to eliminate him as a witness to the crime or to avoid detection, that killing is also in the course of the commission of the underlying felony."

The defendant argues that the burglary was complete at the point that he and the other men entered apartment 101. Therefore, as there was testimony at trial that the residents were still alive at the time the defendant left the building, the addition of the language by the trial court, the defendant contends, improperly expanded the time frame under which the jury could find that the death occurred "in the course of" the burglary.[29] We disagree.

"Felony murder occurs when, in the course of and in furtherance of another crime, one of the participants in that crime causes the death of a person who is not a participant in the crime. . . . The two phrases, in the course of and in furtherance of, limit the applicability of the statute with respect to time and causation." (Internal quotation marks omitted.) *State* v. *Montgomery*, 254 Conn. 694, 733, 759 A.2d 995 (2000). "The phrase in the course of focuses on the temporal relationship between the murder and the underlying felony. . . . We previously have defined the phrase in the course of for purposes of § 53a-54c to include the period immediately before or after the actual commission of the crime . . . ." (Citation omitted; internal quotation marks omitted.) Id., 734.

Our Supreme Court previously has held that a jury instruction phrasing these two requirements in the disjunctive was in error because the statute requires that *both* prongs be met for this element to be satisfied. *State* v. *Scognamiglio*, 202 Conn. 18, 26, 519 A.2d 607 (1987).[30] Thus, an instruction that would allow the jury to find this element met by evidence that satisfies only one prong would be in error. See id.; see also *State* v. *Young*, 191 Conn. 636, 641 n.5, 469 A.2d 1189 (1983).

We agree with the defendant that the primary purpose

of the language as used in our model instructions seems to be as a gloss on the "in furtherance of" prong of this element.[31] This does not mean, however, that the language "in the course of carrying out its objective" refers *solely* to the causality requirement of this element and not also to its temporal requirement. Indeed, we have relied on precisely this language in finding that a challenged instruction sufficiently instructed the jury as to the "in the course of" prong of this element. See *State* v. *Cooke*, 89 Conn. App. 530, 541–42, 874 A.2d 805 (instructions adequately instructed jury on temporal requirements when "the court explained that the death must have been caused during the commission of the robbery *and in the course of carrying out its objective*" and explicitly stated that "the death must have occurred during the actual commission of robbery in the first degree" [emphasis added; internal quotation marks omitted]), cert. denied, 275 Conn. 911, 882 A.2d 677 (2005).

In the present case, the "in the course of carrying out its objective" language in the trial court's instructions on the "in the course of" prong was surrounded by language that focused upon the temporal requirements of this prong. In particular, the court instructed that "[t]he phrase, in the course of the commission, is a time limitation and means conduct occurring immediately before the commission or during the commission of the burglary . . . ." It also stated that the death "must have occurred somewhere within the time span of the occurrence of the facts which constitute the burglary . . . ."

Further, under the facts of this case, there is not a reasonable possibility that any error in including this language could have misled the jury for two additional reasons. First, the phrase that the court used is expressed in the conjunctive rather than the disjunctive; therefore, under the defendant's theory that "in the course of carrying out its objective" requires proof comparable to "in furtherance of" prong, the state would be required to prove both the "in the course of" and the "in furtherance of" prong to prove the "in the course of" prong. Thus, the inclusion of this language does not mandate reversal, either in that its inclusion would have no effect on the outcome because proof of meeting, or failing to meet, this prong similarly would meet or fail to meet the "in furtherance of" prong, or, in the alternative, because it benefits the defendant by imposing a heavier burden on the state than is required. See, e.g., *State* v. *Gradzik*, 193 Conn. 35, 39, 475 A.2d 269 (1984) (instructional errors that benefit defendant not grounds for reversal); *State* v. *Cochran*, 191 Conn. 180, 187–88, 463 A.2d 618 (1983) (same).

Second, although liability for a burglary premised on an unlawful entry attaches upon a defendant crossing the threshold; see *State* v. *Little*, supra, 194 Conn. 675

("the crime proscribed by § 53a-103 [a] is complete once there has been an unlawful entering . . . in a building with the intent to commit a crime in that building"); authority exists that a burglary, once begun, continues until *all* parties participating in the burglary have left the property. See 12A C.J.S. 207, Burglary § 55 (2014) ("burglary does not end when a burglar enters the premises, but continues for as long as the burglar is on the premises with the intent to commit the crime"), citing *Flanders* v. *Meachum*, 13 F.3d 600, 603 (2d Cir. 1994) (applying Connecticut law); see also 12A C.J.S., supra, p. 138 (liability of aider or abetter "is consider[ed] ongoing during the time that the perpetrator remains inside the structure"); 40 C.J.S. 481, Homicide § 62 (2014) ("[a] burglary is deemed to be in progress, for purposes of a felony-murder charge, while the burglar is on the premises"). Although we have not discovered any explicit statements in our precedent to this effect, our courts have upheld felony murder determinations when the predicate crime was a burglary and the deaths occurred at some point after an unlawful entry. See *In re Michael B.*, supra, 36 Conn. App. 374 (probable cause existed to find that murders "occurred after the respondent unlawfully entered the home and before he left the . . . home . . . and therefore within the temporal limitation of when the alleged burglary began and ended");[32] see also *State* v. *MacFarlane*, 188 Conn. 542, 543, 450 A.2d 374 (1982) (homeowner, who had been asleep in residence when burglars entered, awoke and was strangled "during the course of the burglary").

The defendant did not argue at trial that his initial entry was lawful; rather, he relied at trial on the affirmative defense presented in § 53a-54c and on his claim that he acted only under duress. He has not presented any argument to the contrary on appeal. We also note that all of the evidence presented at trial indicates that the victim's death occurred inside apartment 101 and was committed while either the defendant or one of his associates was present. Therefore, we conclude that there is not a reasonable possibility that the inclusion of this language misled the jury.[33]

The defendant's second claim is that, by stating unequivocally that the objective of the burglary was an assault, the trial court committed error because the determination as to what the defendant, Azibo, Azikiwe, and Taylor intended in entering the apartment is solely within the province of the jury. He claims this instruction prejudiced his defense because it removed from the jury's consideration the possibility that the purpose of the burglary was a robbery and limited the defendant's ability to persuade the jury that he lacked the objective to commit an assault although he was present at the scene. We are not persuaded by this argument.

In the present case, the court instructed the jury on the third element of felony murder, framing this element

as follows: "The third element is that the defendant or another participant caused the death of the decedent named in each count while in the course of and in furtherance of the commission of the crime of burglary. This means that the death occurred during the commission of the burglary and in the course of carrying out its objective. And that objective was an assault."

To begin, we note that the statement by the court "that [the] objective [of the burglary] was an assault" followed the court's reading of the amended information and the immediately preceding statements concerning the third element generally; thus, this statement would have been understood by the jury as relating the general elements of the crime to the specific allegations contained within the amended information in a manner that illustrated what the state had to prove. The risk that this statement would be perceived as an unequivocal direction to the precise purpose of the alleged burglary was also undercut by both the court's earlier instructions as to the state's general burden to prove each material element of any crime alleged and its detailed instructions on the state's specific burden to prove that the defendant committed the predicate burglary in the manner alleged by the state.[34] Following the particular language at issue, the trial court again reminded the jury that the state bore the burden of proving beyond a reasonable doubt each of the four elements of felony murder. Finally, with the exception of the statement at issue, which, as previously noted, is equivocal in context, there were no other definite statements by the trial court that reasonably could have compelled the jurors to believe that the court was instructing them that the objective of the burglary *must* have been an assault.

For these reasons, this case is distinguishable from those relied upon by the defendant. See *State* v. *Theriault*, 182 Conn. 366, 376–80, 438 A.2d 432 (1980) (in accessorial liability case, harm caused by "very conclusive nature" of trial court's instruction that "[n]o question" had been raised about defendant's mental state and jury could "treat him as having the mental state required for the commission of the crime if [it found] that he [was] the actual one that did it" not overcome by other portions of charge, including text that immediately followed challenged statement [internal quotation marks omitted]); *State* v. *Rodriguez*, 7 Conn. App. 470, 475–76, 509 A.2d 72 (1986) (where state alleged hindering prosecution in first degree, unequivocal statements by court, which charged jury that murder had been committed and listed time, date, and party responsible for that murder, removed issue from jury's consideration). On the record before us, we conclude that there is not a reasonable possibility that the jury was misled by this statement.

B

Instructions that Death Must Occur

## "in Furtherance of" the Burglary

The defendant's final claim of error concerns the court's instructions as to the requirement that the death of the victim must have occurred "in furtherance of" the burglary. The defendant argues that the charge that the court gave provided insufficient guidance to the jury as to a key aspect of his defense. We are not persuaded.

In this case, the defendant requested the following instruction concerning the requirement that the death be in furtherance of the underlying felony: " 'In further-ance of' the burglary means that the killing must in some way be causally connected to or as a result of the burglary, or the flight from the burglary. The state would have to prove that the deaths of Tina Johnson, James Reid, and Basil Williams were caused by the defendant or another participant in the burglary in the course of, and in furtherance of the crime of burglary. The phrase 'in furtherance of such crime' imposes the requirement of a logical nexus between the felony and the homicide. The connection between the underlying felony and homicide must be more than the mere coinci-dence to time and place. The nexus or connection must be one of logic or plan. This means that the felony murder statute excludes those deaths which are so far outside the plan of the felony and its execution as to be unrelated to them. In other words, a felony murder does not include any killing incidentally committed with the felony but only includes those felonies in the attempted execution of the felony of burglary. Although the homicide itself need not be in the common design, the act which results in death must be in furtherance of the unlawful purpose. In other words, the victims' deaths must have been caused in furtherance of com-mitting the burglary and not merely incidental to it.

"For instance, a murder for personal motive is an example of a death that is so far outside the ambit of the plan of the felony and its execution as to be unrelated to them. A murder for personal motive, then, is not a death 'in furtherance of' the underlying felony."

At trial, the court gave the following instruction to the jury: "In furtherance of the burglary means that the killing must be in some way causally connected to or as a result of the burglary. The actions of the defendant that caused the death of the decedent named in each count must be done to aid the burglary in some way or to further the purpose of the burglary.

"It does not matter that the act that caused the death may have been committed unintentionally rather than with the intention to cause. The defendant is as guilty when committing this form of murder as he would be if he had intentionally committed the act that caused the death."

Following the charge, the defendant objected that his request to charge had included language from Connecti-

cut and New York cases concerning the "in furtherance of" prong.[35] On appeal, he claims that by omitting the requested theory of defense instruction, the court provided insufficient guidance to the jury on his defense that "even if the Aquarts murdered the victims 'in the course of' the burglary, their personal, business-related motive for the murders was so far outside the plan of the underlying burglary with its alleged purpose of committing a misdemeanor assault that it was not 'in furtherance of' that burglary." We disagree.

"Our review of the defendant's claim requires that we examine the [trial] court's entire charge to determine whether it is reasonably possible that the jury could have been misled by the omission of the requested instruction. . . . While a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a [trial] court need not tailor its charge to the precise letter of such a request. . . . If a requested charge is in substance given, the [trial] court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Baltas*, 311 Conn. 786, 808–809, 91 A.3d 384 (2014).

With respect to the defendant's framing of this argument, we agree with the state that the requested instruction on the "in furtherance of" prong goes to a material element of the crime itself and, thus, is not the type of theory of defense instruction that our courts are required to give. "A theory of defense instruction consists of an explanation of the defendant's theory of defense . . . ." *State* v. *Baltas*, supra, 311 Conn. 814. "Courts in Connecticut generally do not provide a theory of defense instruction at the defendant's request, nor is there any requirement that such an instruction be provided. Instead . . . [w]hen a defendant admits the commission of the crime charged but seeks to excuse or justify its commission so that legal responsibility for the act is avoided, a theory of defense charge is appropriate. A defendant must, however, assert a recognized legal defense before such a charge will become obligatory. A claim of innocence or a denial of participation in the crime charged is not a legally recognized defense and does not entitle a defendant to a theory of defense charge." (Citation omitted; internal quotation marks omitted.) Id., 814–15. When the claim of error goes to a material element of a crime rather than a separate legal defense, that claim properly is characterized as a failure to instruct adequately on that element and will be reviewed accordingly. See id., 816–18.

Turning to the substance of the charge, our Supreme

Court in *State* v. *Young*, supra, 191 Conn. 640–41, noted the genesis of the "in furtherance of" prong of § 53a-54c in New York law. The court then reviewed New York case law construing this requirement: "Faced with a claim that in furtherance of meant in aid of or in advancement of, the New York courts have construed the phrase to impose the requirement of a logical nexus between the felony and the homicide. . . . More than the mere coincidence to time and place . . . the nexus must be one of logic or plan. Excluded are those deaths which are so far outside the ambit of the plan of the felony and its execution as to be unrelated to them. . . . The phrase was viewed as incorporating into the New York felony murder provision the previous limitation upon the applicability of the felony murder rule adopted in *People* v. *Wood*, 8 N.Y.2d 48, [167 N.E.2d 736, 201 N.Y.S.2d 328] (1960) [abrogated by *People* v. *Hernandez*, 82 N.Y.2d 309, 624 N.E.2d 661, 604 N.Y.S.2d 524 (1993)]. In that case, where the defendant had been indicted for the deaths of an accomplice as well as of an innocent bystander in a gun battle with the police, both of whom were shot by a tavern owner who was assisting the police, the court upheld the dismissal of the indictment. A felony murder embraces not any killing incidentally coincident with the felony . . . but only those committed by one of the criminals in the attempted execution of the unlawful end . . . . Although the homicide itself need not be within the common design . . . the *act* which results in death must be in furtherance of the unlawful purpose." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Young*, supra, 641–42.

Our Supreme Court agreed with the manner in which New York courts had construed this language: "[T]he phrase in furtherance of was intended to impose the requirement of a relationship between the underlying felony and the homicide beyond that of mere causation in fact, similar to the concept of proximate cause in the law of torts. Primarily its purpose was to limit the liability of a person whose accomplice in one of the specified felonies has performed the homicidal act to those circumstances which were within the contemplation of the confederates to the undertaking, just as the liability of a principal for the acts of his servant is similarly confined to the scope of the agency. All who join in a common design to commit an unlawful act, the natural and probable consequence of the execution of which involves the contingency of taking human life, are responsible for a homicide committed by one of them while acting in pursuance of, or in furtherance of, the common design." (Emphasis omitted; internal quotation marks omitted.) Id., 642. Thus, "[t]he phrase serves to exclude those murders that are committed during the course of an underlying felony but that are wholly unrelated . . . but does not serve to exclude killings that were not intended." (Citation omitted.) *In*

*re Michael B.*, supra, 36 Conn. App. 375.

Pursuant to New York law, a murder wholly caused by a personal motive of an accomplice does not occur "in furtherance of" the underlying felony just because it occurs during the felony. See, e.g., *People* v. *Lewis*, 111 Misc. 2d 682, 685, 444 N.Y.S.2d 1003 (1981) ("[e]ven when the homicide is committed by one of the persons engaged in the underlying felony, if that person acts for a private purpose unrelated to the felony, the remaining members of the group are not liable for the murder"); see also *People* v. *Wood*, supra, 8 N.Y.2d 52 ("[w]here . . . the felon kills someone during the felony, but in a separate and distinct act and to satisfy his own end, his accomplice in the felony is not guilty of murder"). Neither our Supreme Court nor this court, however, has ever required affirmatively an instruction as to the effect of a separate personal motive on this prong. In *State* v. *Allen*, 216 Conn. 367, 386–88, 579 A.2d 1066 (1990), our Supreme Court considered a claim of instructional error similar to the one advanced by the defendant,[36] but determined that the trial court's charge[37] adequately instructed the jury on the required causal connection between the felony and the deaths. Further, we note that, prior to its decision in *State* v. *Young*, supra, 191 Conn. 636, our Supreme Court upheld jury instructions that were substantially less descriptive as to the requirement that the resulting death must occur in furtherance of the defendant and his associates' shared design. See *State* v. *MacFarlane*, supra, 188 Conn. 551 (court did not define "in furtherance of" in its charge).

Finally, our courts have recognized that burglary is a crime that, by its nature, involves a recognizable risk of injury and death to others. See *In re Michael B.*, supra, 36 Conn. App. 376 ("[i]t is very likely that in the course of committing a burglary a burglar will encounter an occupant of the dwelling, who may resist, and, in furtherance of the burglary, death of the dweller may likely result"), citing *State* v. *MacFarlane*, supra, 188 Conn. 553. This risk of death is especially clear when the burglary itself is predicated on a plan to commit an assault. See *People* v. *Henderson*, 25 N.Y.3d 534, 541, 35 N.E.3d 840, 14 N.Y.S.3d 770 (2015) ("there is a clear logical nexus between defendant's felony of unlawfully entering the victim's apartment to assault him and the homicide, which was certainly not coincidental").

In this case, the trial court's instructions on the "in furtherance of" prong, which essentially mirror those in our model jury instructions; see Connecticut Criminal Jury Instructions (4th Ed. 2008 [Rev. to November 17, 2015]) § 5.4-1, available at http://jud.ct.gov/ji/criminal/Part5/5.4-1.htm (last visited April 29, 2016); adequately explained the causal connection required by this prong. The court's remaining instructions concerning the elements of felony murder, which either are unchallenged

or which we already have determined were not in error; see part II B 2 of this opinion; included a direction that, to find that the defendant participated in the crime of burglary, he must have knowingly and unlawfully entered the apartment with the specific intent of committing an assault.

Finally, the court instructed the jury on the defendant's affirmative defense pursuant to § 53a-54c[38] and on his claim of duress,[39] both of which advanced the concerns of the defendant's proposed instructions that he did not share the motivations of Azibo and Azikiwe in their execution of the burglary. Therefore, because the jury necessarily accepted that the defendant entered the apartment intending to commit an assault and there was evidence from multiple sources that the baseball bats that the defendant brought were likely the instruments causing the deaths of the residents, we cannot conclude that there was a reasonable possibility that the jury was misled because the act that caused the residents' death—specifically, being repeatedly struck by baseball bats[40]—would have remained within the reasonable contemplation of the participants to this burglary.

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] The victim is unrelated to the defendant.

[2] The defendant was acquitted as to the counts arising from the felony murder and kidnapping of Reid (counts two and five) and Williams (counts three and six).

[3] Azibo is known by a number of nicknames, including "Dee" and "Dready."

[4] Like his brother, Azikiwe was known by a number of nicknames, including "Z," "Ziggy," and "Ozzie."

[5] Taylor did not observe anyone threatened, forced, or ordered to put on the gloves or masks.

[6] It is unclear whether the incident that Hodges observed was, in fact, the same unsuccessful attempt in which Taylor participated. Hodges did not recall seeing the defendant or Taylor there that night and did not see Azibo or his men holding weapons.

[7] Each of the decedents also was identified as a contributor to, or was not eliminated as a contributor to, many of the samples.

[8] This statistical frequency applies to all potential contributors to a sample.

[9] In particular, Evangelista's external examination of the body revealed multiple visible injuries to her head and face as well as a wrist fracture that, although not visible, could be felt clearly through the skin. During his subsequent internal examination, Evangelista observed numerous internal injuries consistent with blunt force trauma, including lacerations and bruises to the exterior of the victim's head, damage to her left eyeball, fractures in her skull and cheekbones, and bruising and bleeding in the brain.

[10] The defendant originally appealed to this court from the judgment of conviction on April 17, 2014. On November 6, 2014, the appeal was transferred from this court to the Supreme Court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c). Subsequently, on February 4, 2015, the Supreme Court transferred this appeal back to this court.

[11] Subsequent to the defendant's 2013 conviction, § 53a-54c was amended by No. 15-211, § 3, of the 2015 Public Acts; these amendments made technical changes and added a separate predicate felony, neither of which are relevant to this appeal. Therefore, we refer to the current revision of the statute.

[12] General Statutes § 53a-3 (3), in turn, defines "physical injury" as "impairment of physical condition or pain  . . . ."

[13] The defendant provided a different account for the group's entry into the apartment, stating that: he had been instructed by Azibo to knock on

the door, pretending to be a customer seeking crack cocaine, and then to get out of the way when the door opened; he knocked on the door as instructed; and once the door was opened, the remaining members of the group forced the defendant into the apartment in their efforts to get in themselves.

This alternate account, even if believed, remains unhelpful to the defendant's position for two reasons. First, it corroborates Taylor's testimony that the group's entry into apartment 101 was accomplished by force, but merely changes the precise manner in which that entry was achieved. Second, in the context of appraising an accessory's liability for an assault accomplished or attempted by another, this court has held on two prior occasions that the accessory intended harm to the victim where he or she knew of the principal's motive and knew that the principal was armed, but nevertheless accompanied that principal to the victim's residence and attempted to get the victim in a favorable position for the principal to act. See *State* v. *VanDeusen*, 160 Conn. App. 815, 832–33, 126 A.3d 604, cert. denied, 320 Conn. 903, 127 A.3d 187 (2015); *State* v. *Scheck*, 106 Conn. App. 81, 85–87, 940 A.2d 871, cert. denied, 286 Conn. 918, 945 A.2d 979 (2008).

[14] Our Supreme Court has opined on the limited circumstances in which the absence of a proof of motive might be sufficient to prove lack of intent: "While motive is not an element of a crime that the state has the burden of proving, the presence of evidence of motive may strengthen the state's case. . . . It is conceivable that the evidence adduced in a particular case would be so inconclusive that without evidence of motive a judgment of acquittal might be required because the jury could not rationally find that the state had proved the elements of the charged offense beyond a reasonable doubt. In such a case, a judgment of acquittal might be required not because motive was an element of the offense, but because evidence of motive would strengthen the state's otherwise insufficient evidence of an element of the offense, such as identification or intent. There is, however, only a very limited category of cases in which a lack of proof of motive would mandate a judgment of acquittal." (Citation omitted.) *State* v. *Pinnock*, 220 Conn. 765, 773, 601 A.2d 521 (1992). The present case is "not in that category." Id., 773–74.

[15] "The crime proscribed by the provisions of . . . § 53a-103, is committed completely once a person enters or remains unlawfully in a building with the *intent* to commit a crime therein. . . . Therefore, the state need not prove that a completed crime occurred to convict a defendant of burglary." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Sherman*, 127 Conn. App. 377, 383–84 n.4, 13 A.3d 1138 (2011).

[16] Neither the defendant nor Taylor testified at trial that the defendant had injured anyone directly while in apartment 101. Lashika testified, however, that the defendant had told her, in seemingly contradictory terms, that he had "roughed somebody up" while in the apartment, but had not hurt or killed anyone.

[17] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

Although "[a]n accessory must have both the intent to help the principal and the intent to commit the crime"; *State* v. *Vincent*, 194 Conn. 198, 207, 479 A.2d 237 (1984); "[t]he mental state of an aider and abettor incorporated in § 53a-8 does not require that the accused know of or endorse every act of his coparticipant in crime." *State* v. *McCalpine*, 190 Conn. 822, 832, 463 A.2d 545 (1983).

[18] "Although we note that our Supreme Court recently granted certification to decide whether *Kitchens* should be overruled in *State* v. *Herring*, 151 Conn. App. 154, 94 A.3d 688, cert. granted, 314 Conn. 914, 100 A.3d 849 (2014), the holding in *Kitchens* presently remains binding upon this court." (Internal quotation marks omitted.) *State* v. *Young*, 161 Conn. App. 552, 562 n.5, 129 A.3d 127 (2015).

[19] Neither of the court's drafts of its proposed charges is in the record or was otherwise submitted to this court.

[20] We rely on the preceding statements, presented by the defendant in his January 22, 2014 renewed motion for a judgment of acquittal or, in the alternative, for a new trial, to the extent that the state has not disputed them and nothing in the record contradicts them. See *State* v. *Bharrat*, 129 Conn. App. 1, 17 n.9, 20 A.3d 9 (relying on factual assertions in state's brief that prior versions of charges not contained in record "encompassed the

same instructions that the court ultimately delivered to the jury"), cert. denied, 302 Conn. 905, 23 A.3d 1243 (2011).

[21] In his posttrial motion, however, the defendant provided greater detail, noting that "the felony murder charge was revised after counsel for both parties consulted and agreed that the [trial court's] instruction was insufficient because it failed to articulate the elements of burglary, the predicate offense for felony murder."

[22] In particular, the court provided the following instructions on the third element of felony murder: "The third element is that the defendant or another participant caused the death of the decedent named in each count while in the course of and in furtherance of the commission of the crime of burglary.

"This means that the death occurred during the commission of the burglary and in the course of carrying out its objective. And that objective was an assault.

"Now, in the course of the commission of the burglary means during any part of the defendant's participation in the burglary. The phrase, in the course of the commission, is a time limitation and means conduct occurring immediately before the commission or during the commission of the burglary and in the course of carrying out its objective.

"Thus, the death of the decedent named in each count must have occurred somewhere within the time span of the occurrence of the facts which constitute the burglary and in the course of carrying out its objective.

"Also, the immediate murder of a person to eliminate a witness to a crime or to avoid detection is also in the course of the commission. In this regard, if you find one or more persons—or one or more of the decedents, I should say—was killed simply to eliminate him as a witness to the crime or to avoid detection, that killing is also in the course of the commission of the underlying felony.

"In furtherance of the burglary means that the killing must be in some way causally connected to or as a result of the burglary. The actions of the defendant that cause the death of the decedent named in each count must be done to aid the burglary in some way or to further the purpose of the burglary.

"It does not matter that the act that caused the death may have been committed unintentionally rather than with the intention to cause. The defendant is as guilty when committing this form of murder as he would be if he had intentionally committed the act that caused the death."

[23] Defense counsel stated the following: "On the felony murder instruction we had substituted proposed language on the 'in the course of' language to—that defined proximate cause. We had also included language that further defined 'in furtherance' that was taken from the Supreme Court decision[s] of *State* v. *Allen* [216 Conn. 367, 579 A.2d 1066 (1990)] and *State* v. *Young* [191 Conn. 636, 469 A.2d 1189 (1983)]. Those citations are in the request.

"We had also articulated language from New York courts, which had been cited in the *Allen* case, that were consistent with our theory of defense, which is that it cannot be in furtherance of if it was—the homicide was committed for the personal motive of one of the participants involved.

"Your Honor had added language to the 'in the course of' element to say that it could happen in the course of the burglary or in the course of carrying out its objective. And the carrying out of its objective portion, we submit, is not consistent with the law."

[24] The following exchange took place between the court and defense counsel:

"The Court: I will say—and I appreciate your wish to articulate—but to the extent—just so that you have your record protected, to the extent that you filed a request to charge and I have not given the proposed instructions, I acknowledge that I have not . . . and you have those preserved.

"[Defense Counsel]: Then the only thing I'll add just because it's not—it's the—Your Honor added language instead of failing to . . . incorporate what we proposed, is on the affirmative defense. . . .

"The Court: Well—but again, I would say, if I failed to charge *either by way of addition or subtraction*, any deviation from your request to charge, I'll acknowledge that and you can have that on the record." (Emphasis added.)

[25] We note that both *Paige* and *Johnson* involved whether a party subsequently had waived an issue initially preserved by a request to charge by failing to also take an exception to the charge and involved slightly different factual circumstances, in that the defendant filed a request to charge, the court either failed completely to include the charge as given or omitted certain paragraphs from the requested language, and the defendant failed

to take an explicit exception to the language. See *State* v. *Johnson*, supra, 316 Conn. 53–57; *State* v. *Paige*, supra, 304 Conn. 438–46.

[26] We do not believe, however, that the language acts *solely* as a gloss on the "in furtherance of" prong. See part II A 2 of this opinion.

[27] We, therefore, do not have to address whether the defendant's exception to the charge as given sufficiently stated the ground for the exception to preserve the claim on appeal.

[28] The defendant challenges three instances of the phrase "in the course of carrying out its objective" in the trial court's instructions to the jury on the third element of felony murder. The latter two such instances distinctly occurred during the trial court's discussion of the "in the course of" prong. In the first such instance, however, the trial court used the phrase in precisely the same manner that the defendant did in his request to charge. Thus, although the gravamen of the defendant's claim survives, the defendant cannot rely on this first instance because any error arising from it was induced.

[29] The defendant does not contest, however, that the actions which led to the victim's death occurred while the Aquarts were still in the apartment.

[30] The court, however, held that it was not reasonably possible that the jury was misled due to the remainder of the charge. See *State* v. *Scognamiglio*, supra, 202 Conn. 26–28.

[31] "The third element [of felony murder] is that the defendant or another participant caused the death of <insert name of decedent> while in the course of, and in furtherance of, the commission or attempted commission of the crime of <insert underlying felony>, or, in immediate flight from the crime. This means that the death occurred during the commission of the <insert underlying felony> and in the course of carrying out its objective." Connecticut Criminal Jury Instructions (4th Ed. 2008 [Rev. to November 17, 2015]) § 5.4-1, available at http://jud.ct.gov/ji/criminal/Part5/5.4-1.htm (last visited April 29, 2016).

[32] In *In re Michael B.*, supra, 36 Conn. App. 373, there was no direct evidence that the respondent had entered the home with the residents' permission, but circumstantial evidence supported an inference that the respondent had entered the residence in the late morning, when he knew none of the residents would be home. Further, although there was no direct evidence that the respondent had possessed the intent when he had entered the residence, there was circumstantial evidence that he had formed such an intent while he unlawfully remained when, inter alia, he shot the residents' dog and fired bullets into the bedrooms of the residents in the late morning or early afternoon. Id., 367, 373–74. Thus, as evidence suggested that the two deaths at issue occurred between 2:30 and 3:30 p.m. when the two of the residents returned home; id., 367–68; any burglary pursuant to § 53a-103 was potentially ongoing for several hours prior to the residents' deaths. See id., 373–74.

[33] Accordingly, we also reject the defendant's unpreserved claim that this same alleged instructional error necessitates a new trial on the kidnapping count as well.

[34] The trial court offered the following instructions: "The first element is that the defendant, acting either alone or with one or more person, committed the crime of burglary. Here, of course, the state claims that the defendant acted with one or more persons.

"For purposes of the crime of felony murder, the state must prove that the defendant committed a burglary. The gist of the crime of burglary is the knowing and unlawful entry into a building with the intent to commit a crime therein. . . .

"The state claims that the defendant intended to commit the crime of assault. An assault is the intention to cause physical injury to another person, coupled with causing such injury to such person or to a third person."

The court then clarified what was required for the jury to find that the defendant acted intentionally and the manner in which the jury could determine such behavior before repeating that "the burden of proving intent beyond a reasonable doubt is on the state."

[35] The state does not contest that this claim is preserved.

[36] Relying on New York cases, the defendant in *Allen* requested the following instructions: "8. A murder for personal motive is an example of a death that is so far outside the ambit of the plan of the felony and its execution as to be unrelated to them. A murder for personal motive, then, is not a death in furtherance of the underlying felony. . . .

"9. Similarly, where a felon kills someone during the commission of a felony, but in a separate and distinct act and to satisfy his own end, his accomplice in the felony is not guilty of murder." (Citation omitted; internal quotation marks omitted.) *State* v. *Allen*, supra, 216 Conn. 386 n.8.

[37] "Specifically, the trial court in *Allen* instructed: [T]he State . . . would have to prove that the death of [the victim] was caused by [the defendant] or [his accomplice] in the course of, and in furtherance of the crimes of either burglary or robbery. The phrase in furtherance of such crime imposes the requirement of a logical nexus, that is a connection between the felony and the homicide. The connection between the underlying felony and homicide must be more than the mere coincidence of time and place. The nexus or connection must be one of logic or plan. This means that the felony murder statute excludes those deaths which are so far outside the plan of the felony and its execution as to be unrelated to that. In other words, a felony murder does not include any killing incidentally committed with the felony but only includes those felonies in the attempted execution of the felony of burglary and robbery. Although the homicide itself need not be in the common design, the act which results in death must be in furtherance of the unlawful purpose. In other words, [the victim's] death must have been caused in furtherance of committing the burglary or robbery and not merely incidental to it." (Internal quotation marks omitted.) *State* v. *Allen*, supra, 216 Conn. 387–88.

[38] "Pursuant to § 53a-54c, if a defendant charged with felony murder was not the sole participant in the underlying crime, that defendant may claim as an affirmative defense that he or she: (1) [d]id not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury. The defense is only effective if all four elements are met. The burden of proving these elements is on the defendant, who must prove their existence by a preponderance of the evidence." (Internal quotation marks omitted.) *State* v. *Small*, 242 Conn. 93, 99–100, 700 A.2d 617 (1997).

[39] General Statutes § 53a-14 provides: "In any prosecution for an offense, it shall be a defense that the defendant engaged in the proscribed conduct because he was coerced by the use or threatened imminent use of physical force upon him or a third person, which force or threatened force a person of reasonable firmness in his situation would have been unable to resist. The defense of duress as defined in this section shall not be available to a person who intentionally or recklessly places himself in a situation in which it is probable that he will be subjected to duress."

[40] We recognize that there was some testimony that Womble kept a table leg in apartment 211 and that the blood spatter located in apartment 101 would be consistent with the use of either a baseball bat or a table leg. Nevertheless, the weight of the testimony at trial, including the statements which the defendant's sister attributed to him, concerned baseball bats being brought to apartment 101, subsequently used in the murders, and discarded afterward.