******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# EFRAIN JOHNSON *v.* COMMISSIONER OF CORRECTION
## (AC 47645)

Elgo, Suarez and Norcott, Js.

*Syllabus*

The petitioner, who previously had been convicted after a jury trial of felony murder and kidnapping, appealed following the denial of his petition for certification to appeal from the habeas court's judgment denying his petition for a writ of habeas corpus. He claimed, inter alia, that his criminal trial counsel rendered ineffective assistance in failing to meaningfully convey to him the state's last best plea offer. *Held*:

The habeas court did not abuse its discretion in denying the petitioner's petition for certification to appeal, as the petitioner failed to establish that the issues he raised were debatable among jurists of reason, that a court could resolve them in a different manner, or that the questions were adequate to deserve encouragement to proceed further.

The habeas court properly concluded that the petitioner's criminal trial counsel did not render ineffective assistance, as the court's finding that counsel adequately conveyed the state's plea offer to the petitioner was not clearly erroneous, the court having credited counsel's testimony that he had relayed the offer to the petitioner, explained the strengths and weaknesses of the state's case, and recommended that the petitioner accept the offer.

The habeas court did not err in denying the petitioner's claim that the state violated his right to due process under *Brady* v. *Maryland* (373 U.S. 83) when it failed to disclose to him an alleged agreement not to prosecute a witness in exchange for the witness' testimony at the petitioner's criminal trial, the petitioner having presented no evidence of any such agreement or understanding, implicit or explicit, between the state and the witness.

Submitted on briefs January 20—officially released April 28, 2026

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Bhatt, J.*; judgment denying the petition; thereafter, the court denied the petition for certification to appeal, and the petitioner appealed to this court. *Appeal dismissed*.

*J. Patten Brown III*, assigned counsel, filed a brief for the appellant (petitioner).

*Christopher A. Alexy*, senior assistant state's attorney, and *Joseph T. Corradino*, state's attorney, filed a brief for the appellee (respondent).

*Opinion*

ELGO, J. The petitioner, Efrain Johnson, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. On appeal, the petitioner contends that the court abused its discretion in denying his petition for certification to appeal and improperly denied his claims that (1) his criminal trial counsel rendered ineffective assistance when advising the petitioner of the state's plea offer, and (2) the prosecutor's failure to disclose certain benefits that allegedly were given to a testifying witness in exchange for the witness' cooperation at the petitioner's criminal trial violated the petitioner's rights to due process and to a fair trial in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and its progeny. We conclude that the habeas court did not abuse its discretion in denying the petition for certification to appeal and, accordingly, dismiss the appeal.

This court previously summarized the facts and procedural history of the petitioner's underlying criminal trial in the petitioner's direct appeal as follows. "By way of an amended information dated December 18, 2013, the state charged the [petitioner] with six offenses: as a principal in the felony murders of three individuals, namely, the victim, James Reid, and Basil Williams (counts one, two, and three, respectively), and as a principal in the kidnapping in the first degree for those same people (counts four, five, and six, respectively).[1] . . . For

---

[1] "The [petitioner] was acquitted as to the counts arising from the felony murder and kidnapping of Reid (counts two and five) and Williams (counts three and six)." *State* v. *Johnson*, 165 Conn. App. 255, 258 n.2, 138 A.3d 1108, cert. denied, 322 Conn. 904, 138 A.3d 933 (2016). Tina Johnson is identified as the victim, who "is unrelated to the [petitioner]." Id., 258 n.1.

most of the time relevant to this case, Azibo Aquart[2] headed a criminal organization selling crack cocaine and marijuana in certain cities in southern Connecticut. As part of this operation, Azibo used certain apartments at 215 Charles Street in Bridgeport, in particular using apartment 211 on the second floor to conduct transactions. Azibo considered the apartments his 'turf' and had driven away competitors on prior occasions.

"Azibo's enterprise involved a number of individuals in a variety of tasks. Two such confederates were Azibo's brother, Azikiwe Aquart,[3] and Rodney Womble. Other individuals employed by Azibo included: Frankie Hodges, who sold crack cocaine out of apartment 211 at 215 Charles Street; John Taylor, who sold marijuana on Azibo's behalf in Norwalk; Lashika Johnson, the [petitioner's] sister, who sold crack cocaine and marijuana on behalf of Azibo and, later, Azikiwe, and who was dating Azibo for much of the time relevant to this case; and the [petitioner], who purchased marijuana from Azibo both for personal use and to resell. A number of the individuals working for Azibo's drug enterprise either began as customers or were otherwise users of Azibo's product themselves.

"During much of August, 2005, the victim, Reid, and Williams lived in apartment 101 at 215 Charles Street. Both the victim and Reid used crack cocaine and regularly purchased it from Azibo's operation in apartment 211.

"In early August, 2005, the quality of the crack cocaine that Azibo was selling in 215 Charles Street decreased substantially. At about this time, the victim stopped purchasing crack cocaine from Azibo's operation on the second floor and began selling crack cocaine out of

---

[2] "Azibo is known by a number of nicknames, including 'Dee' and 'Dready.'" *State* v. *Johnson*, 165 Conn. App. 255, 258 n.3, 138 A.3d 1108, cert. denied, 322 Conn. 904, 138 A.3d 933 (2016).

[3] "Like his brother, Azikiwe was known by a number of nicknames, including 'Z,' 'Ziggy,' and 'Ozzie.'" *State* v. *Johnson*, 165 Conn. App. 255, 259 n.4, 138 A.3d 1108, cert. denied, 322 Conn. 904, 138 A.3d 933 (2016).

apartment 101. As a consequence, Azibo began losing a number of customers.

"Azibo was displeased by the victim's actions and subsequently attempted on at least two occasions to break into apartment 101 with the assistance of various confederates. During one such instance, Hodges heard a knock on the door of apartment 211 in the middle of the night. Looking through the peephole, Hodges observed Azibo, who was wearing black clothing, a black bandana, and plastic gloves and motioning for Hodges to join him in the hallway. Azibo whispered to Hodges to go to the first floor and knock on the door to a specific apartment. As Hodges and Azibo headed downstairs, Hodges perceived that three people were in the second floor laundry room; although he avoided looking at the people's faces, he could see that all of them also were wearing plastic gloves. While Azibo hid in the stairwell, Hodges knocked on the door to apartment 101, but nobody came to the door. Relieved that no one had answered, Hodges informed Azibo and returned to the second floor while Azibo and the three other individuals went downstairs.

"Taylor also was present for two of the attempts to enter the first floor apartment. In the first attempt, Taylor received a phone call from Azibo. Taking the train from Norwalk to Bridgeport, Taylor met up with Azikiwe and Azibo; at Azibo's direction, the group drove to a Walgreens store, where Azibo purchased duct tape. The three then drove to the diner near 215 Charles Street. By the time they arrived at the diner, it was dark outside. The group waited at the diner until Azibo got a phone call, at which point they went out to the parking lot. The [petitioner] met the three men in the parking lot of the diner. He brought two bats with him, giving one to Azikiwe and retaining the other. The bats were the first weapons that Taylor observed among the four men. In the parking lot, Azibo told Taylor, Azikiwe, and the [petitioner] that there were people selling drugs out of his building, '[h]e had a problem' with this, and the group was going to go in and 'confront them.' The four men

voluntarily put on masks and latex gloves provided by Azikiwe,[4] entered the building, and waited down the hall while a young woman knocked on the door to apartment 101. When no one answered, Azibo, Azikiwe, and Taylor went upstairs, and the [petitioner] left with the bats.[5]

"A second attempt involving Taylor to enter apartment 101 occurred a few days after the first attempt. During the day on August 23, 2005, the [petitioner] contacted Azibo about getting more marijuana. Azibo brought the marijuana over to the [petitioner] and, giving the [petitioner] two additional bags, stated that he might need a favor later. That evening, the [petitioner], with the assistance of Lashika and others, promoted a party at a Bridgeport club. Between approximately 1:30 to 2:30 a.m. on August 24, 2005, the group finished cleaning up and went to a restaurant in Orange. While there, Lashika received a phone call from Azibo, who asked to speak with the [petitioner]. The [petitioner] did not look upset after receiving this phone call. After finishing their meal, Lashika and the [petitioner] left the restaurant in separate vehicles. Returning home, Lashika saw Azibo outside her apartment, though she did not see the [petitioner]; after seeing Azibo, Lashika went to sleep.

"Taylor also received a phone call from Azibo and drove to Bridgeport that night, where he met up with Azibo and Azikiwe. Azikiwe drove the group to the parking lot underneath the apartments at 215 Charles Street. Exiting the car, Taylor saw the [petitioner] walking up to them. The [petitioner] again brought two bats with him, which were the first weapons that Taylor had observed among the four men on this occasion as well, and all of the

---

[4] "Taylor did not observe anyone threatened, forced, or ordered to put on the gloves or masks." *State* v. *Johnson*, 165 Conn. App. 255, 261 n.5, 138 A.3d 1108, cert. denied, 322 Conn. 904, 138 A.3d 933 (2016).

[5] "It is unclear whether the incident that Hodges observed was, in fact, the same unsuccessful attempt in which Taylor participated. Hodges did not recall seeing the [petitioner] or Taylor there that night and did not see Azibo or his men holding weapons." *State* v. *Johnson*, 165 Conn. App. 255, 261 n.6, 138 A.3d 1108, cert. denied, 322 Conn. 904, 138 A.3d 933 (2016).

men put on latex gloves and masks provided by Azikiwe. Taking care not to be seen, the group went upstairs to apartment 101. During this period, Taylor observed that both the [petitioner] and Azikiwe were armed with baseball bats, while Azibo had a gun. Once there, one or more members of the group forced open the door to apartment 101, and the four men entered the apartment.

"Inside the apartment, Azibo instructed Taylor to stand by the living room window and to take a lookout position. Azibo and Azikiwe then proceeded to use duct tape to bind the victim and Reid in the first bedroom. While duct taping these two individuals, Azibo's gloves ripped, and he replaced them; Azikiwe similarly replaced his gloves while in the apartment. The [petitioner] likewise participated in binding the victim's wrists and ankles to some degree. While in the apartment, Taylor also observed the [petitioner] standing in the hallway by the bathroom near the first bedroom. Walking between the window at which he was stationed and the bedroom, Taylor saw both Azibo and Azikiwe strike the victim and Reid in the head multiple times with the baseball bats. At some point while the men were in the apartment, Williams was bound and injuries similar to those suffered by the victim and Reid were inflicted upon him. Additionally, one of the four participants inserted several screws into the doorjamb of the front door from the inside before leaving through the window. Again, Taylor did not observe the [petitioner] being threatened by, or try to stop, Azibo and Azikiwe during their time in apartment 101.

"Eventually, the four left the apartment: Taylor and Azikiwe in one vehicle, and the [petitioner] and Azibo in another. The [petitioner] observed a black drill in a bag that Azibo brought with him to the car after leaving the apartment. The [petitioner], Azibo, and Azikiwe reconvened at Lashika's apartment, where the [petitioner] frequently stayed. Lashika was awakened by voices in her living room, two of which she was able to identify as the [petitioner] and Azibo. Leaving her bedroom, she discovered the [petitioner], Azibo, and Azikiwe sitting

in the living room. Azibo and Azikiwe were wearing only undershirts, shorts, and socks. Azibo asked Lashika to take the garbage bags and a black electric drill belonging to Azibo to a dumpster down the street. Lashika disposed of the bags as requested, wearing plastic gloves to move the items. When she returned, Azibo asked her to move his car and retrieve clothing for him from his apartment, which she did. Azibo, Azikiwe, and the [petitioner] were all there when she came back from this second errand.

"Later that morning, the victim's son, Leroy Whittingham, attempted to call his mother multiple times, but was unable to reach her. At or about 10 a.m., he walked over to his mother's apartment; getting no response when he knocked on her front door, he walked around the side of the building to the window of her bedroom. Discovering the window open, Whittingham pushed the blinds aside and saw the victim and Reid. Both parties were bound in duct tape on the floor, and there was blood on the floor and ceiling. Whittingham entered the apartment and called 911 from his cell phone. An ambulance and police were dispatched.

"Karen O'Donnell, an emergency medical technician for American Medical Response, and her partner, Rosanna Mendoza, received the call at approximately 10:15 a.m. Driving toward the address to which they were directed, O'Donnell saw a person waving them down and pointing to the apartment building behind the diner. O'Donnell and her partner entered the building; while they were walking up the stairs toward the apartment, Whittingham kicked open the front door. Discovering the victim and Reid in the first bedroom and Williams in the second bedroom, O'Donnell and her partner quickly determined that all three residents were deceased.

"Investigators processed the apartment over the course of three days. They discovered the screws that had been affixed to the front door and door frame from inside the apartment, which would have prevented the door from being opened. Investigators also discovered various items and removed them from the apartment for further

examination; these items included pieces of latex and latex gloves, samples of blood-like substances, the duct tape used to bind the head, hands, and feet of the three residents, and two plastic bags stuck together with duct tape. Additionally, after removing the duct tape binding the victim's wrists, investigators discovered a piece of latex attached to the inside of the duct tape. No weapons were recovered from the apartment.

"The items collected were turned over to the state forensic laboratory, and forensic testing determined that many of the fingerprints that were discovered in the apartment or on the items seized as evidence were attributable to Azikiwe and Azibo. DNA was also extracted from the various gloves, latex fragments, and other items recovered from apartment 101, and was submitted for further testing. This testing compared DNA profiles developed from these recovered samples to profiles of known samples taken from the involved parties. The profiles developed for each sample were then cross-referenced with a database, which allows the technicians to determine the frequency with which an individual within the three major population groups of Connecticut (African-American, Caucasian, or Hispanic) would be expected to be a contributor. This testing identified Azikiwe, Azibo, and the [petitioner] as contributors to the various samples, while none of the three of them or Taylor could be eliminated as a contributor to other samples.[6] Only the [petitioner] was a contributor to the sample of DNA taken from the latex fragment recovered from the duct tape binding the victim's wrists; each of the other known samples was eliminated. The expected frequency of a person being a contributor to that particular sample was one in seven billion individuals from the three population groups.[7]

---

[6] "Each of the decedents also was identified as a contributor to, or was not eliminated as a contributor to, many of the samples." *State* v. *Johnson*, 165 Conn. App. 255, 265 n.7, 138 A.3d 1108, cert. denied, 322 Conn. 904, 138 A.3d 933 (2016).

[7] "This statistical frequency applies to all potential contributors to a sample." *State* v. *Johnson*, 165 Conn. App. 255, 265 n.8, 138 A.3d 1108, cert. denied, 322 Conn. 904, 138 A.3d 933 (2016).

"Frank Evangelista, associate medical examiner for the state, conducted the autopsy of the victim in August, 2005. External and internal examinations revealed profound and substantial injuries to the victim's wrist, face, skull, and brain.[8] These injuries, both external and internal, were consistent with blunt force trauma and would have required multiple blows. Consequently, Evangelista concluded that the victim's death had been caused by blunt head trauma inflicted by another party. The autopsies of Reid and Williams revealed that they had suffered similar injuries, which caused their deaths.

"A few days after August 24, 2005, the [petitioner] went to a music concert with Lashika, Azibo, and Azikiwe, and when the [petitioner's] sister drove him to Philadelphia a few weeks later, Azikiwe joined them. Although the [petitioner] did not know that Azikiwe would be joining them on the trip to Philadelphia, he did not voice any reluctance about Azikiwe joining them. When Lashika eventually inquired about what happened at 215 Charles Street, the [petitioner] responded that he had not hurt or killed anyone, though he had 'roughed somebody up,' that he had helped tie up someone, and that the group had gotten rid of the bats they had with them in the apartment.

"On March 6, 2007, the [petitioner] was interviewed by Christopher Munger, a special agent with the Federal Bureau of Investigation (FBI), at its Bridgeport office. When asked about his involvement in the events at 215 Charles Street, the [petitioner] changed his story multiple times. He first claimed that he had not been there

---

[8] "In particular, Evangelista's external examination of the body revealed multiple visible injuries to her head and face as well as a wrist fracture that, although not visible, could be felt clearly through the skin. During his subsequent internal examination, Evangelista observed numerous internal injuries consistent with blunt force trauma, including lacerations and bruises to the exterior of the victim's head, damage to her left eyeball, fractures in her skull and cheekbones, and bruising and bleeding in the brain." *State* v. *Johnson*, 165 Conn. App. 255, 265 n.9, 138 A.3d 1108, cert. denied, 322 Conn. 904, 138 A.3d 933 (2016).

for seven to nine years. When told that his DNA had been recovered from apartment 101, the [petitioner] asked if he could 'start over.' In his second version of events, the [petitioner] told the agent that he had been asked by Azibo on August 23, 2005, to go up to the door and pretend to be interested in buying crack cocaine, that he got into a verbal altercation with the woman who opened the door, that during this incident, he spit in her face, she slammed the door, and that he left afterward. When told that the DNA had been recovered from the latex glove fragment in the duct tape bindings, the [petitioner] asked to start over again. This time, the [petitioner] provided an account of his involvement that placed him in the apartment binding the victim's wrists and feet with duct tape on the day that she was killed.

"Over the course of the investigation, cell phones were seized from the [petitioner] and Azikiwe, and investigating detectives became aware of a phone number that ultimately was attributed to Azibo. Information was obtained both from these cell phones, and from records of the associated service providers for these phones and numbers associated with Womble, Taylor, the victim, and Lashika. Analyzing this information, agents with the FBI were able to identify a number of calls during the days leading up to the murders between the phones associated with Azibo, Azikiwe, the [petitioner], and Taylor. In particular, this information showed that: the phone seized from the [petitioner] had been in contact with the phone associated with Azibo seven times on August 24, 2005, the first time being at 1:47 a.m. and the last at 5:50 a.m.; the last phone to call the phone associated with Azibo was the phone associated with Taylor; there was no contact between the phone associated with Azibo and any other phone between 5:04 and 5:43 a.m.; and the first number that the phone associated with Azibo called after 5:43 a.m. on August 24, 2005, was the phone associated with the [petitioner]." (Footnotes in original.) *State* v. *Johnson*, 165 Conn. App. 255, 258–67, 138 A.3d 1108, cert. denied, 332 Conn. 904, 138 A.3d 933 (2016).

The petitioner subsequently was charged with three counts of felony murder in violation of General Statutes § 53a-54c[9] and three counts of kidnapping in violation of General Statutes § 53a-92 (a) (2) (A).[10] Id., 258. Prior to the commencement of the petitioner's criminal trial, the state sent counsel for the petitioner a plea offer, memorialized in a letter dated November 26, 2013, which stated in relevant part: "The [s]tate's last best offer in this case would permit the [petitioner] to enter guilty pleas to three counts of kidnapping in the first degree for an agreed sentence of twenty . . . years in the custody of the [C]ommissioner of [C]orrection, followed by five . . . years special parole. The [s]tate would enter a nolle prosequi on each count of felony murder. In addition, the [s]tate would join the [petitioner's] request to award him jail credit from the date of his arrest on federal charges in 2007, although he is only legally entitled to credit on a sentence in this case from August 17, 2011, the date of his arrest on these charges."[11] The petitioner declined the state's offer and proceeded to trial.

Following a jury trial, the petitioner was found guilty of the felony murder and kidnapping of Tina Johnson and was acquitted of all other charges and lesser included

[9] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, such person commits or attempts to commit . . . kidnapping . . . and, in the course of and in furtherance of such crime or of flight therefrom, such person, or another participant, if any, causes the death of a person other than one of the participants . . . ."

Although § 53a-54c was amended in 2015; see Public Acts 2015, No. 15-211, § 3; that amendment has no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[10] General Statutes § 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him . . . ."

[11] The petitioner was involved in two criminal cases regarding this incident, one federal criminal case and one state criminal case. In his federal trial, "the [D]istrict [C]ourt granted the defense motion for judgment of acquittal on the basis that there was no evidence that [the petitioner] was part of the [other defendants'] criminal enterprise." After the federal trial, the state prosecuted the petitioner in regard to

offenses. The trial court subsequently sentenced the petitioner to a total effective term of fifty years of imprisonment. See *State* v. *Johnson*, supra, 165 Conn. App. 267. The petitioner appealed from that judgment, which this court affirmed. See id., 304.

On September 3, 2019, the petitioner filed a petition for a writ of habeas corpus. His operative petition, the July 14, 2020 amended petition for a writ of habeas corpus, contained three counts. Count one alleged ineffective assistance of counsel on the part of his criminal trial counsel, Attorney Todd Bussert, on a variety of grounds, including his failure to "meaningfully convey" the state's last best plea offer.[12] Counts two and three alleged that the petitioner's rights to due process and a fair trial were violated. On January 23, 2024, the respondent, the Commissioner of Correction, filed a return in response to the petitioner's amended petition for a writ of habeas corpus. At the habeas trial, the court heard testimony from the petitioner, Bussert, and State's Attorney Joseph T. Corradino, who was the prosecutor at the petitioner's criminal trial.

In its subsequent memorandum of decision, the habeas court concluded, inter alia, that the petitioner had not demonstrated deficient performance on the part of Bussert for failing to "meaningfully convey the plea offer of twenty years . . . ." The court also rejected the petitioner's due process claims for lack of proof and, accordingly, denied the amended petition for a writ of habeas corpus. The petitioner then filed a petition for certification to appeal to this court, which the habeas court denied, and this appeal followed.

I

On appeal, the petitioner first claims that the habeas court abused its discretion in denying his petition for

his involvement in the homicides that took place. The state "trial was duplicative of the federal trial in terms of the evidence presented."

[12] At the petitioner's habeas trial, the petitioner withdrew multiple allegations of deficient performance on the part of Bussert. In this appeal, the petitioner claims that Bussert performed deficiently by failing to meaningfully convey the state's plea offer to the petitioner.

certification to appeal and wrongfully denied his claim that Bussert performed deficiently when he represented the state's plea offer to the petitioner. We disagree.

Our standard of review is well established. "Faced with the habeas court's denial of certification to appeal, a petitioner's first burden is to demonstrate that the habeas court's ruling constituted an abuse of discretion. . . . If the petitioner succeeds in surmounting that hurdle, the petitioner must then demonstrate that the judgment of the habeas court should be reversed on its merits." (Citations omitted.) *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994).

"A petitioner may establish an abuse of discretion by demonstrating that the issues are debatable among jurists of reason . . . [a] court could resolve the issues [in a different manner] . . . or . . . the questions are adequate to deserve encouragement to proceed further. . . . In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. . . .

"A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel. Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that

discretion under state law. To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time. . . .

"Because a petitioner's failure to satisfy either prong is fatal to a habeas petition . . . our courts, in reviewing ineffective assistance of counsel claims, can find against a petitioner . . . on either the performance prong or the prejudice prong, whichever is easier . . . . It is well established that the failure to adequately advise a client regarding a plea offer from the state can form the basis for a sixth amendment claim of ineffective assistance of counsel." (Citations omitted; internal quotation marks omitted.) *Dixon* v. *Commissioner of Correction*, 233 Conn. App. 851, 856–58, 342 A.3d 260, cert. denied, 353 Conn. 918, 345 A.3d 808 (2025).

Regarding rejected plea offers, our Supreme Court has explained that "the specific underlying question of whether there was a reasonable probability that a habeas petitioner would have accepted a plea offer but for the deficient performance of counsel is one of fact, which will not be disturbed on appeal unless clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the [habeas] court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the [habeas] court's ruling." (Citations omitted; internal quotation marks omitted.) *Barlow* v. *Commissioner of Correction*, 343 Conn. 347, 357–58, 273 A.3d 680 (2022); see also *Dixon* v. *Commissioner of Correction*, supra, 233 Conn. App. 861 ("It is

well established that the appellate courts of this state cannot evaluate the credibility of the witnesses. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Internal quotation marks omitted.)).

In the present case, the habeas court found that the "credible evidence from [Bussert] establishes that he adequately conveyed the twenty year offer to [the petitioner], explaining to him that [Bussert] believed he would get convicted after the state trial and that he should accept the offer," and that "he adequately explained all components of that offer to [the petitioner]." At the habeas trial, Bussert testified that he had relayed the state's plea offer to the petitioner, explained the strengths and weaknesses of the state's case to the petitioner, and recommended that the petitioner accept the state's offer. We further note that, prior to the commencement of the petitioner's state criminal trial, the court thoroughly canvassed the petitioner regarding his decision to reject a plea offer from the state.[13] Although the petitioner testified somewhat to the contrary, specifically, that he was unaware that the plea offer only contemplated pleading guilty to the kidnapping charges and that he was unaware of the retroactive confinement credit to 2007, such testimony does not persuade us that the court erroneously found that Bussert adequately conveyed the

[13] It is unclear if this rejected plea offer is the same offer that was memorialized in the November 26, 2013 letter, or some other offer. The following colloquy occurred between the petitioner and the court:

"The Court: So, once . . . your federal case was resolved . . . myself and [Bussert] and the prosecutor had a number of serious discussions about your case to see whether or not there was a possibility of resolving the case short of trial. And I assume [Bussert] kept you up to speed on what was happening here in court in Bridgeport?

"[The Petitioner]: Yes, Your Honor.

"The Court: Okay. . . . [A]ll those discussions ultimately came down to a proposal to you that, if you were willing to enter pleas, that the

state's plea offer. The habeas court could have chosen not to credit the petitioner's testimony. Bussert testified that he relayed the state's offer to the petitioner, and the habeas court credited that testimony.[14] Moreover, Bussert testified to the petitioner's unwillingness to enter

state would recommend a sentence of twenty years as a penalty in your case. I assume that was conveyed to you by [Bussert]?

"[The Petitioner]: Yes, Your Honor.

"The Court: "Okay. And did you and [Bussert] . . . generally talk about the subject matter of the pros and cons of either accept[ing] a plea offer or going to trial? Did you discuss that back and forth with him?

"[The Petitioner]: Yes.

"The Court: Okay. And did he answer any questions that you might have had about . . . one path versus a different path?

"[The Petitioner]: Yes.

"The Court: All right. And my understanding is that you have elected not to resolve the case on the twenty year offer but, instead, have the case . . . go to trial . . . is that right?

"[The Petitioner]: Yes.

"The Court: Okay. So . . . that's your choice to make and you could make it. . . . But . . . before we leave it, I just need to say this to you, sir, and that is this . . . each of these charges is a felony murder . . . carrying a mandatory minimum sentence of twenty-five years [of] imprisonment and a maximum sentence of sixty years [of] imprisonment; do you understand that?

"[The Petitioner]: Yes.

"The Court: And on a murder charge in Connecticut, there [is] no parole. In other words, you don't do half or two thirds or even 85 percent of your sentence and then go in front of a parole board. It's day-for-day time that you serve these murder charges; do you understand that?

"[The Petitioner]: Yes.

"The Court: . . . My experience is that, on cases like this, if someone is convicted after trial they [would receive] sentences far greater than twenty years [of imprisonment]. You realize [that] you run the risk of getting a much more severe sentence if you lose your trial; you understand that, sir?

"[The Petitioner]: Yes. . . .

"The Court: Okay. . . . I just need to make sure you understand the risks in terms of choosing one course over another. And . . . it sounds to me like you've given this some thought and you're firm in your conviction that you want to go to trial.

"[The Petitioner]: Yes."

[14] Although Bussert testified, at one point, that he had not discussed the retroactive prison credit with the petitioner, Bussert later clarified that he "had a conversation" with the petitioner "consistent with . . . what was reflected in that letter from [the state] in terms of the parameter of the offer." Moreover, on cross-examination, Bussert

any plea agreements. In light of the deference applied to the court's credibility assessments and the weight afforded to testimony, we conclude that the habeas court's finding that Bussert had adequately conveyed the state's plea offer to the petitioner is not clearly erroneous.[15] See *Barlow* v. *Commissioner of Correction*, supra, 343 Conn. 357–58; *Dixon* v. *Commissioner of Correction*, supra, 233 Conn. App. 861.

## II

The petitioner also claims that the habeas court abused its discretion in denying his petition for certification to appeal because it had improperly denied his claims regarding his rights to due process and to a fair trial. The petitioner's substantive claim is that the prosecutor's failure to disclose certain benefits that allegedly were given to a testifying witness in exchange for the witness' cooperation at the petitioner's criminal trial violated the petitioner's rights to due process and to a fair trial under *Brady* and its progeny. We disagree.

We begin with our standard of review. "The prerequisite of any claim under . . . *Brady* . . . is the existence of an undisclosed agreement or understanding between the cooperating witness and the state. . . . Normally, this is a fact based claim to be determined by the trial court, subject only to review for clear error. . . . [T]he burden is on the defendant to prove the existence of undisclosed exculpatory evidence. . . .

testified affirmatively that he had relayed the plea offer of twenty years of imprisonment, as extended by the state to the petitioner.

[15] Although the habeas court did not address the prejudice prong of the ineffective assistance of counsel test, it is axiomatic that "a court may resolve ineffective assistance of counsel claims on either the performance prong or the prejudice prong." *Williams* v. *Commissioner of Correction*, 223 Conn. App. 745, 762, 310 A.3d 381, cert. denied, 349 Conn. 901, 312 A.3d 586 (2024). Accordingly, "[i]n light of our determination that the petitioner failed to establish that [counsel's] performance was deficient, we need not address the prejudice prong." (Internal quotation marks omitted.) *Jan G.* v. *Commissioner of Correction*, 237 Conn. App. 115, 143 n.25, 350 A.3d 1156, cert. granted, 354 Conn. 930,     A.3d     (2026).

"Whether the petitioner was deprived of his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review. . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct . . . and whether they find support in the facts that appear in the record." (Citations omitted; internal quotation marks omitted.) *Brown* v. *Commissioner of Correction*, 230 Conn. App. 384, 398, 330 A.3d 134, cert. denied, 351 Conn. 921, 333 A.3d 103 (2025). To the extent that the petitioner challenges the factual basis of the court's decision, however, "we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) Id., 399; see also *Barlow* v. *Commissioner of Correction*, supra, 343 Conn. 357–58. Moreover, "[t]he question of whether there existed an agreement between [a witness] and the state is a question of fact . . . ." (Internal quotation marks omitted.) *Diaz* v. *Commissioner of Correction*, 174 Conn. App. 776, 798, 166 A.3d 815, cert. denied, 327 Conn. 957, 172 A.3d 204 (2017).

The "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady* v. *Maryland*, supra, 373 U.S. 87. As our Supreme Court has observed, "[i]t is well established that [i]mpeachment evidence as well as exculpatory evidence falls within *Brady*'s definition of evidence favorable to an accused. . . . A plea agreement between the state and a key witness is impeachment evidence falling within the definition of exculpatory evidence contained in *Brady*. . . .

"The [United States] Supreme Court established a framework for the application of *Brady* to witness plea agreements in *Napue* v. *Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959), and *Giglio* v. *United*

*States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). . . . [D]ue process is . . . offended if the state, although not soliciting false evidence, allows it to go uncorrected when it appears. . . . If a government witness falsely denies having struck a bargain with the state, or substantially mischaracterizes the nature of the inducement, the state is obliged to correct the misconception. . . . Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading. . . . A new trial is required if false testimony could . . . in any reasonable likelihood have affected the judgment of the jury. . . . The prerequisite of any claim under the *Brady*, *Napue*, and *Giglio* line of cases is the existence of an undisclosed agreement or understanding between the cooperating witness and the state." (Citations omitted; internal quotation marks omitted.) *State* v. *Ouellette*, 295 Conn. 173, 185–86, 989 A.2d 1048 (2010); see also *Diaz* v. *Commissioner of Correction*, supra, 174 Conn. App. 798 ("Any . . . understanding or agreement between any state's witness and the state police or the state's attorney clearly falls within the ambit of *Brady* principles. . . . An unexpressed intention by the state not to prosecute a witness does not." (Internal quotation marks omitted.)).

This agreement between the state and the testifying witness need not be an explicit agreement for it to fall within the ambit of *Brady* and its progeny. Our Supreme Court has observed that the state's "practice of informal, off-the-record leniency understandings with cooperating witnesses . . . often involve a prosecutor's suggesting—although not promising—that a favorable recommendation to the sentencing judge and/or a reduction in the charges against the witness might be forthcoming in exchange for the witness' testimony inculpating another defendant. . . . [T]hese 'hypothetical' outcomes serve as a real incentive to motivate a witness to testify for the state." (Citations omitted.) *Marquez* v. *Commissioner of Correction*, 330 Conn. 575, 603–604, 198 A.3d 562 (2019). As this court has observed, "what constitutes

an agreement or understanding between the state and a cooperating witness for *Brady* purposes is broadly defined and must be determined on a case-by-case basis. Evidence of such an agreement is not limited to what might be deemed formal plea agreements pertaining to specific charges, promises to recommend a specific sentence, or even express promises by the state to bring a witness' cooperation to the attention of a sentencing judge. In light of its potentially high value to the defense as fodder for impeachment, evidence that reasonably suggests that an informal understanding between the state and a cooperating witness exists, or reasonably may be viewed as an inducement by the state, falls within the ambit of what must be disclosed." *Brown* v. *Commissioner of Correction*, supra, 230 Conn. App. 412; see also *Diaz* v. *Commissioner of Correction*, supra, 174 Conn. App. 798 ("evidence that merely *suggests* an informal understanding between the state and a state's witness may constitute impeachment evidence for purposes of *Brady*" (emphasis in original)).

In the present case, the habeas court found that there was no evidence in the record that there had been any understanding, informal or otherwise, between Taylor and the state in exchange for Taylor's testimony. The petitioner nevertheless contends that the state's general practice of declining to prosecute defendants after they had already been convicted in a federal court constitutes a benefit. As the petitioner argues, Taylor, who had pleaded guilty to federal charges and who was not charged by the state, was therefore the beneficiary of this general practice, which should have been disclosed to the jury.

The petitioner's claim, however, must fail because, on the basis of our careful review of the record, the petitioner presented no evidence at the habeas trial that any such agreement or understanding, implicit or otherwise, existed between Taylor and the state in exchange for Taylor's testimony at the petitioner's underlying criminal trial.[16] See *Owen* v. *Commissioner of Correction*, 234

[16] Taylor's agreement with the federal prosecuting authority was disclosed, and Bussert elicited testimony at the petitioner's underlying

Conn. App. 481, 498, 344 A.3d 158 ("It is . . . well established that the burden of establishing grounds for relief in a habeas corpus proceeding rest[s] with the petitioner. . . . The petitioner, as the plaintiff in a habeas corpus proceeding, bears a heavy burden of proof." (Internal quotation marks omitted.)), cert. denied, 353 Conn. 923, 345 A.3d 812 (2025). Specifically, there is no evidence in the record that the state explicitly or implicitly expressed to Taylor or his attorney its decision not to prosecute Taylor, much less in some exchange for his testimony. There similarly is no evidence in the record that Taylor knew of the state's decision or general practice of declining to prosecute defendants who had been convicted in federal court.[17] In light of the foregoing, we conclude that the court did not err in denying the petitioner's due process claim and, subsequently, did not abuse its discretion in denying the petitioner's petition for certification to appeal.

Thus, we conclude that the petitioner has failed to establish that the issues he raised are debatable among jurists of reason, that a court could resolve them in a different manner or that the questions he raised are adequate to deserve encouragement to proceed further. See, e.g., *Santana* v. *Commissioner of Correction*, 208 Conn. App. 460, 469–70, 264 A.3d 1056, cert. denied, 340 Conn. 920, 267 A.3d 857 (2022). We therefore conclude that the habeas court did not abuse its discretion in denying the petitioner's petition for certification to

criminal trial regarding that plea offer and cooperation agreement, including other benefits Taylor incurred from the federal government. In that testimony, Taylor stated that he had received no benefits from the state, such as a promise not to prosecute, other than the benefits he received from the federal government.

[17] Taylor was not produced as a witness at the petitioner's habeas trial. As the court found, "any claims directed at [Bussert's] cross-examination of [Taylor] are denied for lack of proof. The court cannot evaluate the effectiveness of any further questioning without . . . responses to those questions. . . . Similarly, the [petitioner's] due process claims must be denied." Moreover, as the petitioner admits in his principal appellate brief, "there is no mention of any discussion that took place between the prosecuting authorities and Taylor regarding the practices of the state."

appeal from the judgment denying his amended petition for a writ of habeas corpus.

The appeal is dismissed.

In this opinion the other judges concurred.